Forchelli, Curto, Deegan, Schwartz,
Mineo, Cohn & Terrana, LLP
The Omni
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
Tel. No. (516) 248-1700
Fax No. (516) 248-1729
By: Gary M. Kushner
    Brian J. Hufnagel

*Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
| | |
|---|---|
| In re: | Chapter 11 |
| YL WEST 87TH HOLDINGS I, LLC, | Case No. 09-15445 (AJG) |
| Debtor. | |

---------------------------------------------------------X
| | |
|---|---|
| In re: | Chapter 11 |
| YL WEST 87TH STREET, LLC, | Case No. 09-16786 (AJG) |
| Debtor. | |

---------------------------------------------------------X

### DEBTORS' MOTION FOR ORDER TO OBTAIN POST PETITION FINANCING FROM ARKO HOLDINGS, LTD. ON AN <u>EMERGENCY BASIS AND SCHEDULING FINAL HEARING</u>

TO:   THE HONORABLE ARTHUR J. GONZALEZ
      UNITED STATES BANKRUPTCY JUDGE:

YL West 87th Holdings I, LLC ("YL") and YL West 87th Street, LLC ("West"), the debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys Forchelli, Curto, Deegan, Schwartz, Mineo, Cohn & Terrana, LLP, as and for their motion (the "Motion") for entry of an order pursuant to sections 364(c)(1) and 364(d)(1) of the Bankruptcy Code and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing the Debtors to obtain post-petition financing, the terms of which are detailed more fully below,

from Arko Holdings, Ltd. ("Arko"). In support thereof, and upon the annexed affidavit of Yair Levy dated November  , 2009 ("Levy Aff."), the Debtors respectfully state as follows:

## INTRODUCTION

1. This Motion seeks approval of a debtor-in-possession loan from Arko to the Debtors (the "Arko Loan") pursuant to the loan commitment from Arko to the Debtors (the "Loan Commitment," Levy Aff., Ex. A). The Debtors are requesting authorization to obtain financing from Arko for the purpose of completing the construction and development project at the real property owned by West. The Debtors seek authority to obtain a total of $30,000,000 in funding pursuant to the Budget (Levy Aff., Ex. B) and Projections (Levy Aff., Ex. C). The Debtors request approval of the financing on a superpriority basis with a first position and priming lien on the Subject Property. This financing will enable the Debtors to complete the project, reorganize, and make payments to their creditors. The Debtors request interim approval so that they will have the ability to restart the construction project. The first draw on the Arko Loan is not anticipated to take place until after final approval of the loan. The Debtors will file a full set of loan documents (the "Loan Documents") prior to the final hearing on the Motion.

## SUMMARY OF DIP FACILITY

2. The following statement summarizes the material terms of the proposed DIP Facility, in accordance with Local Bankruptcy Rule 4001-2.

    a. <u>Commitment and Availability</u>. The Loan Commitment of $30,000,000, to be used to complete construction of the Project in accordance with a budget and schedule to be approved by Arko. The initial draw under the interim order will fund the commitment fee and constructions costs pursuant to the budget.

    b. <u>Funding.</u> West will submit monthly budgets to Arko along with a corresponding request for funding. Upon receipt, Arko shall provide funding pursuant to the Loan Documents.

c. <u>Use of Funding</u>. The funds available to West pursuant to the Loan Committement shall be used to pay expenses, including, payroll obligations, other continued ordinary course operations, and working capital needs in accordance with the Budget. (Levy Aff., Ex. B.)

d. <u>Term</u>. The earliest of (i) 180 days from execution of the loan documents and/or first funding under the loan, (ii) an event of default under the loan documents, (iii) the filing of a plan that does not provide for full payment to Arko, (iv) the sale of Arko's collateral without Arko's approval, or (v) the date of approval of a plan of reorganization by the Bankruptcy Court, provided that in the event of court approval of a plan acceptable to Arko, the loan will be extended for an additional 12 months.

e. <u>Interest Rate</u>. 15% fixed annual rate, compounded monthly. The loan amount includes a six month interest reserve, which will be funded on a monthly basis.

f. <u>Collateral</u>. The Arko Loan shall be secured by a senior lien on the Subject Property and all assets of the Debtors' estates, superior to all other liens including liens of Garrison and Residential, pursuant to § 364(d) of the Bankruptcy Code, which collateral shall include, without limitation, the Project, subject to the Carve-Out.

g. <u>Carve-Out</u>. No carve-out has yet been agreed to by Arko. The Debtors will be negotiating a carve out, to be funded from the loan proceeds, in the sum of $150,000.00: The Carve-Out includes: (a) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; (b) the fees and expenses of the professionals retained by the Debtors and any official committee of unsecured creditors, (c) reasonable fees and expenses of any chapter 7 trustee, allowable pursuant to section 726(b) of the Bankruptcy Code in an amount not to exceed $5,000.00, provided, however that the carve-out for any chapter 7 trustee and the liens and claims granted to Arko will not be subject or subordinate to any expenses or fees of any party incurred in connection with any action, among other things, (i) challenging the liens and claims of Arko and/or (ii) hindering or delaying Arko's rights in the Collaterl.

h. <u>Super Priority Administrative Expense Status</u>**.** All obligations of the Debtors to Arko under the Arko Loan shall constitute allowed administrative expense claims with priority under section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in Debtor's chapter 11 case, subject only to the Carve-Out.

i. <u>Fees.</u> Arko shall receive a commitment fee of 3% of the loan amount ($900,000) and shall be reimbursed reasonable attorney's fees and expenses incurred related to the execution and implementation of the Arko

Loan provided that the terms of the loan are approved by the Bankruptcy Court.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Application is made pursuant to 11 U.S.C. §§ 364(c) and 364(d) and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF FACTS

**A.  Case Background**

4. On September 9, 2009, YL filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. YL is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On November 12, 2009, West filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. West is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No trustee, examiner or committee of creditors has been appointed in these cases.

7. YL is the sole owner of West. West owns real property known as 101 West 87th Street, New York, NY (the "Subject Property") which it purchased from Columbus Green, L.L.C. on October 21, 2005 for $42,500,000.00

8. West is engaged in a development project at the Subject Property which includes (i) the renovation of existing residential units; (ii) the construction of an additional 40,000 square feet so as to add a four-story townhouse, 23 additional residential units and additional retail space, and (iii) the conversion of existing residential units into condominium

ownership (the "Project").

9. The Debtors project the project to be profitable and that significant equity of approximately $8 million will remain after full payment to creditors. The Debtors profit projections of the Project are annexed as Exhibit "C" to the Levy Affirmation. These projections are based upon a sales expectation of $1,220 per square foot.

10. The projected selling price is a weighted average sales price for all unites in the Subject Property. The building is comprised of gut renovated existing units and newly constructed units which command a premium as they have better amenities. The sixteen contracts which were rescinded were all for the existing building where the selling price averaged $1,208 per square foot. Taking into account the price of newly constructed premium units and decreases consistent with the softer market conditions, the Debtors arrived at an average price of $1,220 per square foot.

11. The projections provide a total cost to complete the Project of $117,954.182 with a net total income of $126,557,606. After completion of the Project and payment of all loans in full, the Debtors calculate that their profit will be approximately $8,603,424.

12. Annexed as Exhibit "B" to the Levy Affirmation is the Debtors' budget of monthly expenses. West currently receives income from tenants at the Subject Property. On an operational basis, West is able to pay all monthly expenses in the ordinary course other than real estate taxes.

13. After the approval of the financing, there will be a period of time of approximately thirty days during which architects, builders, and suppliers will need to be brought back on board and any approvals reinstated or renewed. Immediate approval of the financing is

necessary so that the Project can resume. However, West does not anticipate receiving the first draw until approximately thirty days after the financing is approved.

**B.      Debtor's Pre-Petition Financing**

14.     On September 20, 2007, West borrowed approximately $75,000,000.00 to fund the Project. The money was borrowed from Column Financial, Inc. ("Column") in the form of a Senior Loan ($46 million), a Building Loan ($24 million), and a Project Loan ($5 million) (collectively the "Arbor Loans"). The Arbor Loans were assigned by Column to Arbor Realty SR, Inc. ("Arbor") and later assigned by Arbor to Garrison Residential Funding, LLC ("Residential").

15.     At the same time, YL borrowed $20,000,000.00 from Column under a Mezzanine Pledge and Security Agreement, under which YL secured repayment with its membership interest in West ("Mezzanine Loan"). Column immediately assigned the Mezzanine Loan to Garrison Special Opportunities Fund, LP ("Garrison"). The Mezzanine Loan is not secured by a mortgage on the Subject Property.

16.     In December 2007, Column assigned the Senior Loan, Building Loan and Project Loan to Arbor.

17.     Construction of the Project was commenced. Arbor funded the first nine monthly funding requisitions made by West.

18.     Arbor then willfully stopped funding the Project in November 2008. Arbor's willful default is demonstrable, and was known to Garrison. As a consequence, the Project stopped, the New York State Attorney General required the abandonment of a condominium offering plan accepted for filing, and sixteen condominium contracts for sale of units in excess of $18,000,000.00 were rescinded.

19. Despite numerous demands for Arbor's performance, Arbor refused to fulfill its obligation under the Building Loan Agreement.

20. The Mezzanine Loan was pre-paid out of the funding provided by the Senior Loan, Building Loan and Project Loan. Payments were made until April 2009, when Arbor stopped funding. As a consequence of Arbor's failure to fund, YL could not pay the Mezzanine Loan, or proceed with the Project.

21. Garrison, the holder of the Mezzanine Loan, refused to seek enforcement of its intercreditor agreement with Arbor, which would have forced Arbor to resume funding.

22. Instead, Garrison formed Residential. Garrison funded Residential's acquisition of Arbor's interest in the Senior Loan, Building Loan and Project Loan, at a huge discount, effectively merging its Mezzanine Loan with the aforesaid three loans secured by mortgages on the Subject Property.

23. It is the Debtors' position that when Garrison purchased the mortgages by assignment into Residential, it assumed all the benefits and burdens set forth in those documents. Garrison and Residential apparently thought otherwise.

24. Residential – the now-holder of the Senior Loan, Building Loan and Project Loan – did not fund either. If it had, YL would have been able to pay the installments of the Mezzanine Loan as they became due and proceed toward completion of the Project. This failure to fund cut off YL's ability to pay the Mezzanine Loan and complete the Project.

25. Garrison declared a default under the Mezzanine Loan, and gave notice of its intention to sell YL's interest in West on September 10, 2009.

26. On August 21, 2009, the Debtors filed a Complaint (the "Garrison Litigation") against Garrison and Residential in the Supreme Court of the State of New York,

County of New York, Index No. 111972/09, seeking a declaratory judgment and specific performance. The Garrison Litigation seeks relief on account of the failure of Arbor and Garrison to fund the loans.

27. On September 10, 2009, through the filing of a notice of removal pursuant to Bankruptcy Rule 9027, the Garrison Litigation was removed to the United States District Court for the Southern District of New York, Case No. 09-cv-7818. On October 30, 2009, YL filed a Motion to remand the Garrison Litigation to the Bankruptcy Court. The hearing on the remand motion is scheduled for December 2, 2009.

C. **The Lift Stay Motion of Garrison**

28. On September 14, 2009, Garrison filed a motion (the "Lift Stay Motion") seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for the purpose of continuing collection activities against the property of YL including a foreclosure sale of YL's interest in West.

29. On October 1, 2009, YL filed an opposition to the Lift Stay Motion. The Court considered the Lift Stay Motion and opposition at a hearing held on October 7, 2009. At the conclusion of the hearing, the Court reserved decision on the Lift Stay Motion.

30. Following the hearing and a telephone conference before the Court on October 22, 2009, the Court scheduled a hearing for November 3, 2009 at 11:00 a.m. to address the issue of whether the stay had automatically expired pursuant to 11 U.S.C. § 362(e). At the hearing on November 3, 2009, the Court entered an order reimposing the automatic stay.

31. An evidentiary hearing on the Lift Stay Motion is scheduled for November 18, 2009.

### C. The Debtors' Efforts to Locate Replacement Financing

32. Since the failure of Arbor to fund the Arbor Loans, YL and West have been searching for replacement financing. In connection with the YL filing, YL sought funding to either takeover the mezzanine position of Garrison or alternative funding that would enable completion of the Project and subsequent payment to Garrison. YL and West negotiated funding with Dan Perla and Bonjour Managers LLC, among others, for the purpose of obtaining alternative financing. The Debtors were unable to locate a funder who would provide debtor in possession financing without the granting of a superpriority lien.

### D. The Lender

33. All negotiations associated with the Arko Loan have been at arm's length. Prior to entering into the Loan Committment, the Debtors discussed the possibility of obtaining financing from lenders other than Arko. Ultimately, however, the terms provided by Arko, pursuant to the Loan Commitment, provided the Debtors with the most favorable option for the Debtors' current operational capital needs. In this way, the approval of the Arko Loan is also in the best interests of the Debtors, their creditors, the estate, and all other parties in interest.

## LEGAL ARGUMENT

34. Section 364 of the Bankruptcy Code authorizes the Court to allow the Debtors to obtain post-petition financing from Arko in the manner proposed in the Loan Commitment. The Debtors need funding for their ongoing business operations and to complete the Project. As described above, as security for all borrowing under the Arko Loan, the Debtors propose to grant Arko a super priority administrative claim and a senior lien on and security in all or substantially all of the Debtors' assets, subject to the (to be negotiated) Carve-Out. Such relief is authorized pursuant to sections 364(c)(1), (2) and (3), 364(d)(1), 503(b) and 507 of the Bankruptcy Code.

### The DIP Facility Should be Authorized

35. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain creditor or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtors propose to provide Arko, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

36. The Debtors' goal of a successful reorganization can be achieved only if the Debtors are immediately authorized to borrow up to $30 million under the Arko Loan and to use such proceeds to restart the Project and demonstrate to creditors, customers, vendors and parties in interest that the Debtors have the ability to complete the project. The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

37. The Debtors negotiated with Arko extensively and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in

accordance therewith. *See e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshow Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Curlew Valley Assoc.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

38. Furthermore, section 364(d) does not require that a debtor seek alternative financing form every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

39. The Debtors could not procure postpetition financing which did not seek to prime the existing liens of Garrison and Residential. The Debtors submit that the circumstances of this case require the Debtors to obtain funding under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the Arko Loan reflects the exercise of their sound business judgment.

40. The terms and conditions of the Arko Loan are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms'

length. Accordingly, Arko and all obligations incurred under the Arko Loan should be accorded the benefits of section 364(e) of the Bankruptcy Code.

41. The Debtors have determined in their business judgment that the funding offered by Arko is the only viable course and is in the best interests of the estate. *See Ames Dept. Stores*, 115 B.R. at 40 (asserting the fact that the debtors had contacted four lenders satisfied the requirement of section 364 that the debtors were unable to obtain comparable financing on an unsecured basis). Indeed, without the funding from Arko, the Debtors' operations may be severely interrupted and the value of their assets will be lost. Therefore, it is imperative that the Debtors be authorized to enter into the Arko Loan in order to preserve and maximize the value of their assets.

## Adequate Protection

42. Section 364(d)(1) of the Bankruptcy Code provides that in order to obtain credit secured by a senior lien, the debtor must show that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). In this case, Residential will be adequately protected because the loan proceeds, and increased indebtedness, will be devoted to the completion of the Project which will increase the value of the Subject Property. (*See* Projections, Levy Aff. Ex. "C".)

43. The Debtors intend to show, through the testimony of an appraiser who will value the Subject Property in its current state and after completion, that Residential's position is not only adequately protected but that the value of the Project will increase to Residential's once the construction is completed. The expenditure of the Arko loan proceeds to develop the Project will result in an increase in the value of the Subject Property greater than the

amount of the loan, and this increase in value constitutes "adequate protection" in compliance with section 364(d)(1)(B).

44. In *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) the bankruptcy court concluded that projected property improvements to be made with a senior loan can constitute adequate protection when "there is no question that the property would be improved by the proposed renovations and that an increase in value will result. In effect, a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection." *Id.*

45. In order to evaluate the Debtors' adequate protection argument and the appraisal to be supplied prior to the hearing on this motion, the Court must consider the risks involved with the Project. *See In re Mosello*, 195 B.R. 277, 289-90 (Bankr. S.D.N.Y. 1996) (court found that improvements did not provide adequate protection because construction project was too speculative). The Debtors submit that the projected improvements can and does constitute adequate protection if the value of those improvements is tangibly demonstrated to the Court. Evidence on this point will be provided by the Debtors' appraiser.

**Interim Approval Should be Granted**

46. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. The Debtors request approval on in interim basis of the Arko Loan. Interim approval is necessary so that the Debtors can begin the "spool up" process of bringing architects, contractors, and suppliers back on board and obtaining

necessary approvals. If a final hearing is held within 30 days of interim approval, no draw on the Arko Loan will be required prior to a final hearing. A complete set of loan documents will be filed with the Court prior to the final hearing.

## **NOTICE**

47. The Debtors request that, pursuant to Bankruptcy Rule 9007, notice of this Motion be limited to (i) the Office of the United States Trustee, (ii) the Debtors twenty largest unsecured creditors, (iii) counsel for Garrison and Residential, and (iv) all creditors, parties-in-interest and entities which have requested notice under Bankruptcy Rule 2002. The Debtors submit that such notice is adequate and that no further notice is necessary.

**WHEREFORE,** the Debtors respectfully request that the Court enter an order substantially in the form of the annexed order authorizing the Debtors to enter into the Arko Loan on an interim basis and such other and further relief as the Court may deem just and proper.

Dated: Uniondale, New York
      November 13, 2009

Respectfully submitted,

Forchelli, Curto, Deegan, Schwartz,
Mineo, Cohn & Terrana, LLP
Attorneys for the Debtors and
Debtors in Possession

By: /s/ Brian J. Hufnagel
Gary M. Kushner
A Partner of the Firm
Brian J. Hufnagel
The Omni
333 Earle Ovington Blvd, Suite 1010
Uniondale, New York 11553
Tel. (516) 248-1700
Fax (516) 248-1729