UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| YL WEST 87TH HOLDINGS I, LLC, | Case No. 09-15445 (AJG) |
| Debtor. | |

---------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| YL WEST 87TH STREET, LLC, | Case No. 09-16786 (AJG) |
| Debtor. | |

---------------------------------------------------------X

**AFFIRMATION OF YAIR LEVY IN SUPPORT OF DEBTORS'
MOTION FOR ORDER TO OBTAIN POST PETITION
FINANCING FROM ARKO HOLDINGS, LTD. ON AN
<u>EMERGENCY BASIS AND SCHEDULING FINAL HEARING</u>**

YAIR LEVY makes the following affirmation pursuant to 28 U.S.C. § 1746 under the penalties of perjury:

1. I am a director of YL West 87th Holdings I, LLC ("YL") and YL West 87th Street, LLC ("West"), the debtors and debtors in possession (collectively, the "Debtors"). In that capacity I have personal knowledge of the facts set forth herein.

2. I submit this Affirmation in support of the Debtors' Motion for entry of an order pursuant to sections 364(c)(1) and 364(d)(1) of the Bankruptcy Code and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing the Debtors to obtain post-petition financing from Arko Holdings, Ltd. ("Arko").

## STATEMENT OF FACTS

### The Bankruptcy Filings

3. On September 9, 2009, YL filed for chapter 11 protection in the United States Bankruptcy Court Southern District of New York. YL is operating its business and managing its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. On November 13, 2009, West filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. West is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee, examiner or committee of creditors has been appointed in these cases.

6. On September 14, 2009, Garrison Special Opportunities Fund, LP ("Garrison") filed a motion (the "Lift Stay Motion") seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for the purpose of continuing collection activities against the property of YL including a foreclosure sale of the Subject Property.

7. On October 1, 2009, YL filed an opposition to the Lift Stay Motion. The Bankruptcy Court considered the Lift Stay Motion and the opposition at a hearing held on October 7, 2009. At the conclusion of the hearing, the Court reserved decision on the Lift Stay Motion.

8. Following the hearing and a telephone conference before the Court on October 22, 2009, the Court scheduled a hearing for November 3, 2009 at 11:00 a.m. to address the issue of whether the stay had automatically expired pursuant to 11 U.S.C. § 362(e). At the hearing on November 3, 2009, the Court entered an order reimposing the automatic stay.

9. An evidentiary hearing on the Lift Stay Motion is scheduled for November 18, 2009.

10. As of the date hereof, the Bankruptcy Court has not issued a decision on the Lift Stay Motion.

### **The Arko Loan**

11. The Debtors have negotiated a debtor-in-possession loan (the "Arko Loan") from Arko pursuant to the loan commitment (the "Loan Commitment") from Arko to the Debtors annexed as Exhibit "A".

12. The Debtors seek authority to obtain a total of $30,000,000 in funding pursuant to the Budget (Exhibit "B") and Projections (Exhibit "C"). The Debtors request approval of the financing on a superpriority basis with a first position and priming lien on the Subject Property (defined below). This financing will enable the Debtors to complete the project, reorganize, and make payments to their creditors. The Debtors request interim approval so that they will have the ability to restart the construction project. The first draw on the Arko Loan is not anticipated to take place until after final approval of the loan. The Debtors will file a full set of loan documents prior to the final hearing on the motion for approval of the Arko Loan.

13. The following statement summarizes the material terms of the proposed DIP Facility, in accordance with Local Bankruptcy Rule 4001-2.

    a. <u>Commitment and Availability</u>. The Loan Commitment of $30,000,000, to be used to complete construction of the Project in accordance with a budget and schedule to be approved by Arko. The initial draw under the interim order will fund the commitment fee and constructions costs pursuant to the budget.

    b. <u>Funding.</u> West will submit monthly budgets to Arko along with a corresponding request for funding. Upon receipt, Arko shall provide funding pursuant to the Loan Documents.

    c. <u>Use of Funding</u>. The funds available to West pursuant to the Loan

        Committement shall be used to pay expenses, including, payroll obligations, other continued ordinary course operations, and working capital needs in accordance with the Budget. (Levy Aff., Ex. B.)

d.    <u>Term</u>. The earliest of (i) 180 days from execution of the loan documents and/or first funding under the loan, (ii) an event of default under the loan documents, (iii) the filing of a plan that does not provide for full payment to Arko, (iv) the sale of Arko's collateral without Arko's approval, or (v) the date of approval of a plan of reorganization by the Bankruptcy Court, provided that in the event of court approval of a plan acceptable to Arko, the loan will be extended for an additional 12 months.

e.    <u>Interest Rate</u>. 15% fixed annual rate, compounded monthly. The loan amount includes a six month interest reserve, which will be funded on a monthly basis.

f.    <u>Collateral</u>. The Arko Loan shall be secured by a senior lien on the Subject Property and all assets of the Debtors' estates, superior to all other liens including liens of Garrison and Residential, pursuant to § 364(d) of the Bankruptcy Code, which collateral shall include, without limitation, the Project, subject to the Carve-Out.

g.    <u>Carve-Out</u>. No carve-out has yet been agreed to by Arko. The Debtors will be negotiating a carve out, to be funded from the loan proceeds, in the sum of $150,000.00: The Carve-Out includes: (a) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; (b) the fees and expenses of the professionals retained by the Debtors and any official committee of unsecured creditors, (c) reasonable fees and expenses of any chapter 7 trustee, allowable pursuant to section 726(b) of the Bankruptcy Code in an amount not to exceed $5,000.00, provided, however that the carve-out for any chapter 7 trustee and the liens and claims granted to Arko will not be subject or subordinate to any expenses or fees of any party incurred in connection with any action, among other things, (i) challenging the liens and claims of Arko and/or (ii) hindering or delaying Arko's rights in the Collaterl.

h.    <u>Super Priority Administrative Expense Status</u>. All obligations of the Debtors to Arko under the Arko Loan shall constitute allowed administrative expense claims with priority under section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in Debtor's chapter 11 case, subject only to the Carve-Out.

i.    <u>Fees.</u> Arko shall receive a commitment fee of 3% of the loan amount ($900,000) and shall be reimbursed reasonable attorney's fees and expenses incurred related to the execution and implementation of the Arko

Loan provided that the terms of the loan are approved by the Bankruptcy Court.

14. Since the failure of Arbor to fund the Arbor Loans (as described below), YL and West have been searching for replacement financing. In connection with the YL filing, YL sought funding to either takeover the mezzanine position of Garrison or alternative funding that would enable completion of the Project and subsequent payment to Garrison. YL and West negotiated funding with Dan Perla and Bonjour Managers LLC, among others, for the purpose of obtaining alternative financing.

15. The Debtors have been unable to locate a funder who would provide debtor in possession financing without the granting of a superpriority lien. The Loan Commitment represents the best available financing that the Debtors could obtain.

16. All negotiations associated with the Arko Loan have been at arm's length. Prior to entering into the Loan Commitment, the Debtors discussed the possibility of obtaining financing from lenders other than Arko. Ultimately, however, the terms provided by Arko, pursuant to the Loan Commitment, provided the Debtors with the most favorable option for the Debtors' current operational capital needs. In this way, the approval of the Arko Loan is also in the best interests of the Debtors, their creditors, the estate, and all other parties in interest.

**The Subject Property**

17. YL is the sole owner of West. West owns real property known as 101 West 87th Street, New York, NY (the "Subject Property") which it purchased from Columbus Green, L.L.C. on October 21, 2005 for $42,500,000.00.

18. West's Project, as planned, was to (a) renovate existing residential units, (b) increase the size of the building on the Subject Property by 35,000 - 40,000 square feet so as to add a four-story townhouse, 23 additional residential units and additional retail space to the

Subject Property, and (c) convert the residential units to condominium ownership (the "Project").

19. In order to fund the Project, West borrowed the following funds from Column Financial, Inc. ("Column"):

a. $46,047,973.80 on September 20, 2007, evidenced by a consolidated, amended and restated Promissory Note dated as of September 20, 2007, secured by a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement dated September 20, 2007 ("Senior Loan"). The Mortgage was recorded in the Office of the Register of the City of New York, County of New York, on September 27, 2007;

b. $23,777,026.20 under a Building Loan Note dated as of September 20, 2007 made by West to Column to be paid under a Building Loan Agreement between West and Column and secured by, among other things, a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 20, 2007 ("Building Loan"). The Building Loan Mortgage was recorded in the Office of the Register of the City of New York, County of New York, on September 27, 2007; and

c. $5,175,000.00 under a Project Loan Agreement and Project Loan Note, secured by a Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of September 20, 2007. The Project Loan Mortgage was recorded in the Office of the Register of the City of New York, County of New York on September 27, 2007 ("Project Loan") (Senior Loan, Building Loan and Project Loan collectively, "Mortgage Documents").

20. By Assignments of Mortgages dated December 7, 2007, Column assigned to Arbor Realty SR., Inc. ("Arbor") the Senior Loan Mortgage, Building Loan Mortgage and Project Loan Mortgages and all related Mortgage Documents.

21. On September 20, 2007, YL entered into a Mezzanine Loan Agreement with Column whereby Column loaned YL $20,000,000.00 ("Mezzanine Loan"), as evidenced by a Promissory Note dated as of September 27, 2007, secured by, among other things, a Mezzanine Pledge and Security Agreement, dated as of September 27, 2007 ("Pledge Agreement"), under which Column was granted a first priority security interest in 100% of YL's membership interest in West (collectively "Mezzanine Documents").

22. On September 20, 2007, Column assigned the Mezzanine Documents to

Garrison Special Opportunities Fund, LP ("Garrison").

23. West commenced construction of the Project with construction funds provided by Arbor and retained contractors and subcontractors to perform the work on the Project.

24. Under the terms of the Mortgage Documents, West prepared monthly requisitions for payment, which were submitted to Arbor to pay for the work performed. On a regular basis from September 2007 through October 2008, West submitted a series of requests for payment which were all funded by Arbor.

**Arbor's Failure to Fund the Project and Willful Default**

25. On September 30, 2008, West forwarded Draw #9 to Arbor for $789,696.00. West received a partial payment of $640,976.29 from Arbor on October 21, 2008.

26. On October 30, 2008, West forwarded Draw #10 to Arbor for $913,656.77. West never received any monies from Arbor on Draw #10.

27. West prepared requisition #11 for $1,620,721.40 and issued same to Arbor for payment. In breach of the terms of the Mortgage Documents, Arbor never funded requisition #11.

28. Arbor then willfully stopped funding the Project in November, 2008.

29. As a result of Arbor's misapplication of lock box proceeds, interference with the requisition process and refusal to fund requisitions, construction of the Project stopped at the end of December, 2008.

30. As a result of Arbor's wrongful actions, the New York State Attorney General required that the Condominium Offering Plan that had been accepted for filing be abandoned and compelled the sponsor to offer rights of rescission to all vendees. Sixteen

contracts for condominium units, at an aggregate purchase price of $18,000,000.00, were rescinded by purchasers.

31. By letter dated February 3, 2009, West's attorney made written demand that Arbor fund Requisition 10, and that Requisition 11 be funded in good faith, and that operating-expense accounts be disbursed according to the Loan Agreement.

32. Arbor waited six weeks after receiving West's February 3, 2009 letter, during which time it took no action and totally ignored West's demands. It then unjustifiably, arbitrarily and unreasonably claimed, by letter dated March 19, 2009, that West did not comply with the Mortgage Documents.

33. West could not complete the Project without the contractually agreed upon funding. West again wrote Arbor on May 28, 2009, demanding compliance with the Mortgage Documents.

**Garrison's Knowledge of Arbor's Failure to Fund**

34. Meanwhile, based upon three or four conversations and meetings YL's representatives had with Garrison's representatives, it was known to YL's representatives that Garrison, the holder of the Mezzanine Loan, was having its own problems with Arbor, and that Garrison had actual knowledge of Arbor's breach as early as December 2, 2008.

35. Despite West's repeated demands that Arbor continue to fund, Arbor failed to comply. The Mortgage Documents required Arbor to pay the monthly payments due on the Mezzanine Documents from the proceeds funded under the Mortgage Documents. The Mezzanine Loan was pre-paid out of the funding provided under the Mortgage Documents, so those payments continued until April 1, 2009, though Arbor's failure to fund actually occurred in November, 2008.

36. Garrison was well aware of Arbor's failure to fund. Despite that fact, on June 8, 2009, Garrison served YL with a Notice of Default under the Mezzanine Loan Documents, claiming that YL was in default for non-payment of monthly Mezzanine Loan payments due in April and May of 2009.

37. On June 12, 2009, YL'sS attorney rejected Garrison's default claim on the grounds that Garrison had refused to seek enforcement of its intercreditor agreement with Arbor, which would have forced Arbor to resume funding.

**After its Default, Arbor Assigns the
Mortgage Documents to Residential**

38. On June 30, 2009, Arbor assigned the Senior Mortgage, Building Loan Mortgage and Project Loan Mortgage and all Mortgage Documents to newly-formed Residential. With Garrison's funds, Residential purchased the mortgages on the same day it was formed, at a substantial discount: $23,000,000.00 for obligations valued at approximately $55,000,000.00.

39. Residential assumed all of Arbor's agreements and obligations. Each Assignment of Mortgage provides that upon assumption the assignee "agrees to observe, perform and be bound by all of the terms, covenants, agreements, conditions and obligations of Assignor [Garrison] under the Mortgage."

40. Residential is an affiliate, subsidiary, parent and/or related entity of Garrison, which acted in concert with Garrison or for the benefit of both Garrison and Residential.

**Notice of Sale of YL's Interest in West**

41. On July 21, 2008, immediately after the Assignments of Mortgages from Arbor to Residential were recorded, Garrison served a Notice of Acceleration of Mezzanine Loan. On July 28, 2009, Garrison served a notice of a sale of YL's interest in West, scheduled

for September 10, 2009 at the offices of Paul, Hastings, Janofsky & Walker, LLP, attorneys for both Garrison and Residential. The September 10, 2009 sale was stayed as a result of the YL bankruptcy filing.

42. At the telephone conference before the Bankruptcy Court October 22, 2009, the Court scheduled a further hearing for November 3, 2009 to address the issue of whether the stay had automatically expired pursuant to 11 U.S.C. § 362(e) and if so, whether there was any authority for the Court to reimpose the stay given the circumstances of this case. In the interim, the Court treated the stay as being vacated and authorized Garrison to proceed with the noticing of a foreclosure sale provided that the sale not be scheduled prior to November 4, 2009. On October 23, 2009, Garrison served a "Notification of Disposition of Collateral," and scheduled a sale of YL's interest in West for November 4, 2009. The November 4, 2009 sale was stayed as a result of the Court's order reimposing the automatic stay.

**The Lawsuit Commenced by YL and West**

43. Arbor and Residential acted unreasonably, inequitably and unconscionably under the Mortgage Documents by failing to fund the Mortgages despite their obligation to do so.

44. Residential was formed for the sole purpose of taking the assignment of the Senior Mortgage, Building Loan Mortgage and Project Loan Mortgage and all Mortgage Documents with actual knowledge of Arbor's defaults under the Mortgage Documents.

45. On August 21, 2009, YL and West filed a complaint (the "Complaint") against Garrison and Residential in the Supreme Court of the State of New York, County of New York, Index No. 111972/09 (the "Garrison Litigation"). The Complaint seeks the following relief:

(i) on the First Cause of Action, a declaratory judgment under Article 30 of the Civil Practice Law and Rules to determine,

- (a) the validity of the Mortgage Documents and the Mezzanine Loan Documents (more fully described herein),

- (b) the rights and liabilities of the parties under the Mortgage Documents and the Mezzanine Loan Documents,

- (c) the validity of the notice of default and notice of sale under the Mezzanine Loan Documents,

- (d) the applicability of the defense of champerty, voiding the mortgages allegedly held by Residential, and

- (e) the validity of any purported default under the Mezzanine Loan Documents and notice of sale of YL'ss interest in West by virtue of the actions of both Garrison and Residential;

(ii) on the Second Cause of Action, permanently enjoining Garrison from conducting a sale under the Mezzanine Loan Documents and the Mortgage Documents held by Residential and declaring those documents void and cancelled of record;

(iii) on the Third Cause of Action, permanently enjoining Garrison from conducting a sale under the Mezzanine Loan Documents and the Mortgage Documents held by Residential and declaring those Documents void and cancelled of record; and

(iv) on the Fourth Cause of Action, granting judgment directing Residential to specifically perform under the Mortgage Documents and fund the necessary requisitions to complete construction on the Project.

46. YL and West also sought a preliminary injunction to enjoin Garrison from proceeding with the sale of collateral consisting of YL'ss 100% interest in West. A temporary restraining order was granted conditioned on YL'ss posting a $20,000,000.00 bond within a day. Because of Arbor and Residential's failure to fund, the $20,000,000.00 needed was unavailable.

47. On September 10, 2009, through the filing of a notice of removal pursuant to Fed. R. Bankr. P. 9027, the Garrison Litigation was removed to the United States District Court for the Southern District of New York.

### The Debtors' Equity in the Project

48. The Debtors have significant equity in their assets which are essential for their reorganization. The Project is a renovation and development project at the Subject Property to (i) renovate existing residential units; (ii) increase the size of the building by 35,000- 40,000 square feet so as to add a four-story townhouse, 23 additional residential units and additional retail space, and (iii) convert the existing residential units into condominium ownership. The Debtors project the Project to be profitable and that significant equity of approximately $8 million will remain after full payment to Garrison. Annexed as Exhibit "C" are profit projects prepared by YL. These projections are based upon a sales expectation of $1,220 per square foot and assume full payment of all loans including the loans of Garrison and Residential.

49. The projections provide a total cost to complete the Project of $117,954.182 with a net total income of $126,557,606. After completion of the Project and payment of all loans in full, the Debtors calculate that the profit will be approximately $8,603,424.

### Completion of the Project

50. Prior to the failure of Arbor and Residential to fund the Arbor Loans, the Debtors had a condominium plan in place which was approved by the New York State Attorney General. All necessary approvals for the Project had been obtained, and construction was in process. Sixteen contracts for sale of units had been entered into where the selling price averaged $1,208 per square foot. The Project remains in place, viable, and can be restarted in approximately thirty days after the interim approval of financing is obtained. During that thirty day time period, architects, builders, and suppliers will be brought back on board and any approvals will be reinstated or renewed. Immediate approval of the financing is necessary so

that the Project can resume. However, the Debtors do not anticipate receiving the first draw until approximately thirty days after the financing is approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
November 13, 2009

/s/ Yair Levy
Yair Levy