UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| YL West 87th Holdings I LLC, | : | Case No. 09-15445 (AJG) |
| Debtors. | : | |

------------------------------------------------------------

**OPINION GRANTING MOTION OF GARRISON SPECIAL OPPORTUNITIES FUND
LP FOR RELIEF FROM THE AUTOMATIC STAY**

APPEARANCES:

PAUL, HASTINGS, JANOFSKY & WALKER LLP
Counsel for Garrison Special Opportunities Fund, LP
New York, New York

      By:    Harvey A. Strickon, Esq.
                  Gerd Alexander, Esq.

FORCHELLI, CURTO, DEEGAN, SCHWARTZ, MINEO, COHN & TERRANA, LLP
Counsel for the Debtor
New York, New York

      By:    Gary M. Kushner, Esq.
                  Brian J. Hufnagel, Esq.

DOLLINGER, GONSKI & GROSSMAN, LLP
Special Counsel for the Debtor
Carle Place, New York

      By:    Matthew Dollinger, Esq.

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

       Before this Court is a motion (the "Motion") by Garrison Special Opportunities Fund LP,

a Delaware limited partnership ("Garrison"), for the entry of an order pursuant to section 362(d)

of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure granting Garrison relief from the automatic stay to

enforce its security interest with respect to a collateral under the terms of a Mezzanine Pledge

and Security Agreement (the "Mezzanine Agreement") dated as of September 20, 2007 between

Garrison and YL West 87th Holdings I LLC, a Delaware limited liability company (the

"Debtor").

*Background*

The Debtor's sole asset consists of its 100% membership interest in YL West 87th Street,

LLC ("West"). West owns a real property known as 101 West 87th Street, New York, NY (the

"Subject Property") which was purchased from Columbus Green, LLC on October 21, 2005 for

$42,500,000. West purchased the Subject Property in order to convert it into a condominium by

(1) renovating existing residential units; (2) constructing an additional 40,000 square feet so as to

add a four-story townhouse, 23 additional residential units, an additional retail space; and (3)

converting existing residential units into condominium ownership (the "Project").

In an effort to fund the Project, on September 20, 2007, West obtained the following

loans from Column Financial, Inc. ("Column"): (a) a senior loan ("Senior Loan") in the amount

of $46,047,973.80; (b) a building loan ("Building Loan") in the amount of $23,777,026.20; and

(c) a project loan ("Project Loan") in the amount of $5,175,000 ((a), (b), and (c) collectively, the

"Mortgage Loan"). The Mortgage Loan was evidenced by a promissory note, and paid and

secured by loan agreements, mortgages, assigning of leases and rents and security agreements

between West and Column (collectively, the "Mortgage Loan Agreement").

On the same date, the Debtor also obtained a loan in the amount of $20,000,000 (the

"Mezzanine Loan"), pursuant to a Mezzanine Loan Agreement (the "Mezzanine Loan

Agreement"), evidenced by a promissory note and secured by a collateral pledge of the Debtor's

only asset, its 100% membership interest in West (the "Collateral").  Pursuant to an Omnibus

Assignment and Assumption Agreement dated September 20, 2007 (the "Assignment

Agreement"), Column assigned the Mezzanine Loan to Garrison, whereby Garrison succeeded to

all of the rights, title, and interest of Column in the Mezzanine Loan.  Column and Garrison also

entered into an Intercreditor Agreement (the "Intercreditor Agreement") dated September 20,

2007.

On December 7, 2007, Column assigned the Mortgage Loan to Arbor Realty SR, Inc.

("Arbor"), whereby Arbor succeeded to all of the rights, title, and interest of Column in and to

the Mortgage Loan under the Mortgage Loan Agreement.  Construction of the Project

commenced and Arbor funded the first nine monthly funding requisitions made by the Debtor

pursuant to the Mortgage Loan Agreement until November of 2008.[1]  Subsequently, on June 30,

2009, Arbor assigned the Mortgage Loan to an affiliate of Garrison, Garrison Residential

Funding, LLC ("Residential").

The Debtor failed to pay its monthly debt service payment on the Mezzanine Loan to

Garrison due for May, 2009.[2]  Consequently, Garrison notified the Debtor by a letter dated June

8, 2009 that it had committed an event of default under Section 9.1(a)(i)(B) of the Mezzanine

Loan Agreement.  By another letter dated July 28, 2009, Garrison sent the Debtor a notice of

foreclosure sale, advising the Debtor that Garrison would be holding a foreclosure sale of the

Collateral at a public auction.  On August 28, 2009, September 2, 2009, and September 8, 2009,

in accordance with the Uniform Commercial Code ("UCC"), Garrison caused a notice of secured

---

[1] The Debtor alleges that since the Mezzanine Loan was pre-paid out of the funding provided by the Mortgage Loan, Arbor's failure to fund under the Mortgage Loan Agreement caused its failure to pay the Mezzanine Loan monthly installment due for May of 2009.

[2] Garrison alleges that the Debtor failed to pay debt service payments on the Mezzanine Loan for the months of April 2009 through October 2009.

3

party sale ("Advertisement") to be published nationwide in the New York Times. On September 5, 2009, Garrison published another Advertisement in the Real Estate Weekly newspaper.

Further, as a result of the Debtor's default on the Mezzanine Loan, the construction of the Project stopped, the New York State Attorney General required the abandonment of West's condominium offering plan previously accepted for filing, and sixteen condominium contracts for sale of units in the amount of approximately $18,000,000 were rescinded.

On August 21, 2009, West and the Debtor filed a complaint (the "Complaint") against Garrison and Residential in the Supreme Court of the State of New York, County of New York (the "State Court Litigation") seeking, among other things, (1) declaratory judgment of the validity of the Mortgage Loan Agreement and the Mezzanine Loan Agreement, as to the validity of the notice of default and notice of sale under the Mezzanine Loan Agreement, as to the applicability of the defense of champerty, voiding the mortgages allegedly held by Residential, the validity of any purported default under the Mezzanine Loan Agreement and notice of sale of the Debtor's interest in West; (2) permanently enjoining Garrison from conducting a sale under the Mezzanine Loan Agreement and Mortgage Loan Agreement held by Residential; (3) judgment directing Residential to specifically perform under the Mortgage Loan Agreement and fund the construction of the Project. The State Court Litigation has since been removed to this Court.[3]

On September 8, 2009, the Debtor filed an emergency motion with the Supreme Court, New York County, seeking a preliminary injunction to stay the foreclosure sale. The Motion was argued on the same date and Justice James A. Yates conditioned the granting of a temporary restraining order ("TRO") on the Debtor posting a bond of $20,000,000 by 4:30pm on September

---

[3] West has also commenced an action in the Supreme Court of the State of New York (the "Arbor Litigation") seeking money damages in the amount of $50,000,000 against Arbor.

9, 2009.  The Debtor failed to post the $20,000,000 bond and instead filed for relief under chapter 11.

*Procedural History*

On September 9, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Southern District of New York.  The Debtor is operating its business and managing its property as a debtor-in-possession ("DIP") pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[4]

On September 14, 2009, Garrison filed the Motion and on October 1, 2009, the Debtor filed an opposition (the "Opposition") to the Motion.  A hearing on the Motion was held before the Court on October 7, 2009.  Garrison argued, *inter alia*, that (i) the Debtor filed its chapter 11 petition in bad faith under section 362(d)(1), and (ii) there is a lack of equity in the Subject Property and no likelihood of effective reorganization under section 362(d)(2).  The Debtor responded by arguing that (i) Garrison has not met its burden of proof under section 362(d)(1) of proving bad faith filing under the circumstances at bar because, despite the fact that this is a one-creditor case, the Debtor is prepared to confirm a plan of reorganization that would leave Garrison unimpaired through DIP financing; and (ii) based upon appraisal value received by its expert, the Debtor possesses equity in the Subject Property in the amount of approximately $8,000,000.  At the conclusion of the October 7, 2009 hearing, the Court took the Motion under advisement but did not state that the stay would remain in effect until it rendered a decision.

Following the October 7, 2009 hearing and prior to the lapse of the thirty-day period under section 362(e) of the Bankruptcy Code, the Debtor asked Garrison to consent to an extension of the automatic stay pending the Court's ruling on the Motion, but Garrison refused

---

[4] West filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("West Chapter 11 Case") on November 12, 2009.  The West Chapter 11 Case is also pending, as a related case, before this Court.

the request.  Thereafter, on October 14, 2009, the thirtieth day since the date of Garrison's filing

of the Motion, the Debtor filed via Electronic Court Filing ("ECF") and served on Garrison's

counsel via email, a letter requesting an extension of the thirty-day period pursuant to section

364(e) pending the Court's ruling on the Motion.  The Debtor did not otherwise contact the

Court with respect to its request of extension, Garrison did not file a response to the Debtor's

letter, and the Court did not take any action with respect to the Debtor's letter.

Subsequently, on October 22, 2009, the Court *sua sponte* contacted the attorneys

representing the parties to schedule an evidentiary hearing on the issue of the Debtor's equity in

the Collateral under section 362(d)(2).  At the telephonic scheduling conference, Garrison's

attorney stated that it is its position that the automatic stay has terminated by the virtue of

passage of time pursuant to section 362(e).  The Court scheduled a status conference to address

the issue of whether the automatic stay had terminated pursuant to section 362(e) for the

following day on October 23, 2009.  At the October 23, 2009 telephonic conference, the Court

indicated that it would consider the Debtor's arguments with respect to whether the stay had

expired under section 362(e) and, if so, whether the stay should be reimposed under section

105(a) of the Bankruptcy Code, if the Debtor properly filed a motion for such relief.

On November 3, 2009, the Debtor filed a motion (the "Motion to Extend") requesting an

extension of the automatic stay pursuant to section 362(e) or, alternatively, a reimposition of the

automatic stay pursuant to section 105(a) or for a temporary restraining order and preliminary

injunction pursuant to Bankruptcy Rule 7065.  A hearing with respect to the Motion to Extend

was held on November 3, 2009, at which the Court ruled that the automatic stay had been

terminated under section 362(e), but it nevertheless should be reimposed under section 105(a)

pending an evidentiary hearing on the issue of the Debtor's equity in the Collateral under section 362(d)(2).

On November 18, 2009, the evidentiary hearing commenced on the issue of whether the Debtor has equity in the Collateral. At the hearing, Garrison offered (1) the expert testimony and appraisal report of Joel Leitner[5] ("Leitner") on the valuation of the Subject Property; and (2) the testimony of David Moson, an employee of Garrison Investment Group, an affiliate entity of Garrison, who testified to the outstanding indebtedness on the Mortgage Loan and the Mezzanine Loan.

The second day of the hearing was held on November 24, 2009. On that day, the Debtor offered expert testimony and appraisal report of Eric P. Haims[6] ("Haims") on the valuation of the Subject Property and Garrison offered the testimony of Douglas Heller[7] ("Heller"), a former Assistant Attorney General, who testified to the Attorney General approval process of offering plans for condominium conversions. At the conclusion of Haims's testimony, the Debtor proposed to call Gerald Sanders ("Sanders"), an appraiser of Grubb & Ellis Consulting Services Company, for purposes of evidencing the determination made on behalf of a proposed DIP

---

[5] Mr. Leitner is a principal of Leitner Group, Inc. and has been an appraiser for many financial institutions in New York since 1986. Mr. Leitner is a member of the Appraisal Institute, a Fellow of the Royal Institute of Charters and Surveyors, a member of the Real Estate Board of New York, co-chair of the real estate committee for Carnegie Hall, and an adjunct professor at New York University. Mr. Leitner has appraised for hundreds of financial institutions, bridge lenders, construction lenders, and permanent lenders. (1st Evid. Hrg. Tr. 12-14.) Mr. Leitner has had experience dealing with condominium offering plans. He has become familiar with, among other things, the approval process of condominium conversion plans where he often appraised the same property before and after the approval of a conversion plan. (*Id.*)

[6] Mr. Haims is the senior vice president of Jerome Haims Realty, Inc., a firm that specializes in providing appraisals and consulting services. He has a B.A. in political science from the University of Wisconsin-Madison and has had 18 years of experience in appraising properties. Mr. Haims is a state-certified real estate appraiser in the state of New York, MAI designated member of the Appraisal Institute, member of the Real Estate Board of New York as an Appraiser A, and an adjunct lecturer at Baruch College. (2nd Evid. Hrg. Tr. 13.)

[7] Mr. Heller is an attorney who has had decades of experience in working in the condo/co-op field since 1972. He began his career in the Attorney General's office where he investigated, litigated, and reviewed co-op and condo conversion plans. He also worked at a law firm where he represented boards and drafted co-op and condo conversion plans. He has worked at Robinson, Silverman and is currently the head of the Co-op/Condo practice at Herrick, Feinstein for the last three years. During his tenure at the Attorney General's office, Mr. Heller has worked on about ten to fifteen condo conversion plans and about fifty co-op conversion plans. Mr. Heller has also participated and prepared for hundreds of co-op and condo conversion plans. (*Id.* at 133-135.)

lender and to rebut Leitner's testimony.  The Court denied the Debtor's request, however,

because it found that parties each had its opportunity to present one witness on valuation and the

testimony of Sanders would be cumulative testimony on that issue.[8]  Further, the Court found

that Haims had already had an opportunity to rebut Leitner's testimony during his examination.

As instructed by the Court at the conclusion of the hearing, the parties filed post-hearing

briefs and proposed findings of fact and conclusions of law.

*Discussion*

Section 362(a) of the Bankruptcy Code provides that upon the filing of a bankruptcy

petition, a secured creditor is automatically stayed from acting to obtain possession or to exercise

control over property of the debtor's estate.  *See 11 U.S.C. 362(a)*.  However, section 362(d) of

the Bankruptcy Code allows a court to grant relief from the automatic stay.  Section 362(d)(2) of

the Bankruptcy Code provides

> (d) On request of a party in interest and after notice and a hearing, the court shall grant
> relief from the stay provided under subsection (a) of this section, such as by terminating,
> annulling, modifying, or conditioning such stay –
>> (2) with respect to a stay of an act against property under subsection (a) of this
>> section, if –
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

Section 362(d)(2) is written in the conjunctive; both (A) and (B) must be satisfied before

a court may grant relief from the automatic stay under this subsection.  *In re R&G Prop., Inc.*,

---

[8] After the request to offer Sanders as a second valuation expert witness was denied by the Court, the Debtor put
forth its offer of proof.  The Debtor represented that, if called, Sanders would testify to (1) an "as is" value of
$71,700,000 for the Subject Property and a completed value of $106,600,000; (2) Leitner's cash flow discount of
12% in addition to a 15% profit as a percentage of sales results in an implied discount rate of over 43%; (3)
Leitner's methodology of discounting all revenue to present value yet deducting construction costs at full value is
inconsistent; (4) bulk sale discount of 40-50% for the Rent Regulated Units (defined herein) is more reasonable; and
(5) per-square-foot projection of Commercial Units (defined herein) in Leitner's report is inconsistent with true
value, market value, current occupancies, and the per-square-foot level at which the Commercial Units would be
rented for in current market. (2nd Evid. Hrg. Tr. 130-31.)

Case No. 08-10876, 2009 Bankr. LEXIS 1320, 2009 WL 1076703, at *8 (Bankr. D. Vt. April 16, 2009).

As provided in section 362(g) of the Bankruptcy Code, the party opposing relief from stay has the burden of proof on all issues other than the debtor's equity in the property. *11 U.S.C. § 362(g)*; *see Sonnax Indus., Inc. v. Tri Component Prod. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(g) places the burden of proof on the debtor for all issues other than the debtor's equity in the property." (internal quotation omitted)); *In re 500 Fifth Avenue Assocs.*, 148 Bankr. 1010, 1015 (Bankr. S.D.N.Y. 1993), *aff'd*, 1993 WL 316183 (S.D.N.Y. 1993).  The United States Supreme Court held that once a movant establishes that a debtor has no equity in a property, "it is the burden of the debtor to establish that the collateral at issue is necessary to an effective reorganization." *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., LTD*, 484 U.S. 365, 375-76, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) (internal quotations and citation omitted).  As the movant in this case, Garrison carries the burden of proof in establishing that the Debtor has no equity in the Collateral; the Debtor carries the burden of proof with respect to all other issues, which includes proof that the Collateral is necessary to an effective reorganization of its chapter 11 case.

Given that there is only one class of creditors and that class will oppose the Debtor's proposed plan,[9] the only way to confirm the plan would be under section 1129(a)(8)(B), where the non-consenting class is not impaired under the plan.  Therefore, unless the Debtor has enough equity in the Collateral to fund a plan that results in Garrison's being unimpaired, a plan could not be confirmed.  To determine the Debtor's equity, if any, in the membership interest, the Court must first determine the value of the Subject Property and then the value of the Debtor's membership interest in that property.  Significantly, the Collateral at issue is not the

---

[9] Garrison has stated that it would vote against the Debtor's proposed plan of reorganization.

Subject Property – it is the value of the membership interest which gives the holder the right to control West and develop the Project through West in hopes of eventually exploiting financial benefits from this venture.

Courts have defined equity as "the difference between the property value and the total amount of liens against it." *In re Stewart*, 745 F.2d 1194, 1195 (9th Cir. 1984); *In re Garsal Realty, Inc.*, 98 B.R. 140, 154 (Bankr. N.D.N.Y. 1989) (equity is "the remaining interest belonging to one who pledged or mortgaged his property, or the surplus value which may remain after the property has been disposed of for the satisfaction of liens."). In making its determination with respect to valuation, a court should "sift through the appraisal and testimony and make a judgment as to the 'accuracy and credibility' of the appraisers." *In re Whitney Land Holdings, LLC*, No. 08-72076-478, (Bankr. E.D.N.Y. 2009) (unpublished opinion); *see In re Miami Beach Hotel*, 304 B.R. 532, 535, n. 4 (Bankr. S.D. Fla. 2004). Appraisers are called upon to use the best statistics and facts in presenting valuations and courts must examine the reasonableness of financial assumptions used by appraisers. *See In re Carmania Corp. N.V.*, 156 B.R. 119, 121 (Bankr. S.D.N.Y. 1993).

Garrison offered the testimony of Leitner, who concluded that the "as is" market value of the leased fee interest in the Subject Property, as of November 1, 2009, is $44,000,000. In contrast, the Debtor offered the testimony of Haims, who concluded that the "as is" market value of the leased fee interest in the Subject Property, as of November 11, 2009 is $79,605,000.

The Subject Property is located on the northwest corner of West 87th street and Columbus Avenue and extends through the block to the south side of West 88th Street, in the Upper West Side of Manhattan, New York.[10] In its current condition, the Subject Property is a partially

---

[10] The Subject Property is situated on a site that consists of one tax lot identified on the New York County tax maps as Block 1218, Lot 29. The site contains 17,521 square feet of land. (Debtor Ex. C, 5.)

completed condominium renovation/conversion project that consists of a nine-story former

residential rental apartment building containing multiple residential apartment units and 8,159

square feet of ground-level retail space.  Upon completion, the Subject Property will be

comprised of (1) Component 1 – an 11-story and penthouse luxury condominium apartment

building with approximately 83 residential apartment units ("Residential Units");[11] (2)

Component 2 – 8,969 square feet of grade level retail spaces[12] ("Commercial Units") and; (3)

Component 3 – a single-family townhouse (the "Townhouse").[13]

      Both Leitner and Haims agree that the highest and best use[14] of the Subject Property is to

complete converting the existing rental building to condominium use and expand the residential

buildable area.  In reaching the value of the Subject Property, both appraisers considered the

primary approaches to real estate valuation and utilized a combination of the Income

Capitalization Approach[15] and the Sales Comparison Approach[16] in evaluating the different

---

[11] There are some discrepancies regarding whether there are 12 or 13 Rent Regulated Units.  For purposes of this opinion, the Court assumes a total of 13 Rent Regulated Units and a total of 83 Residential Units.

[12] The projected gross building area is 138,827 square feet, of which an estimated 125,566 square feet will be above grade.  The projected gross leasable/sellable residential area will contain 105,080 square feet and gross leasable/sellable retail area (excluding the basement) will contain 8,969 square feet. (Garrison Ex. 1, "Summary of Salient Facts and Conclusions").

[13] The single-family townhouse will be situated on the same tax parcel.  The gross building area is projected to be approximately 4,421 square feet, of which 3,840 square feet is above grade area.  (*Id.*)

[14] The American Institute of Real Estate Appraisers defines the term "Highest and Best Use" as "that reasonable and probable use that will support highest present value, as defined, as of the effective date of the appraisal.  Alternately, that use, from among reasonable, probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest land value."

[15] The Income Capitalization Approach measures value by expectation of future income benefits.  In utilizing this method, an appraiser considers annual existing income and market expenses to determine annual net operating income.  The net operating income level is further processed by using an appropriate capitalization or yield analysis technique to produce an indication of a final value.  Leitner is of the opinion that Direct Capitalization is particularly appropriate for properties with market level leases and Discount Cash Flow is more appropriate for properties encumbered by leases that are above market, below market, and/or expiring within a few years.

[16] The Sales Comparison Approach estimates the market value of a property by comparing it to similar properties that have been sold in the market recently.  In arriving at a subject property's value, sales data for similar properties is researched and analyzed, the amounts paid for these transactions are converted to a unit indicator of value (in this case, the indicator of value is price per square foot of the Subject Property), and the unit indicator is adjusted for any element of difference between the property sold and the property being appraised.

components of the Subject Property.[17]  It is important to note that, in Leitner's analysis of the

Residential Units, he utilized what is known as the bulk sales analysis ("Bulk Sales Analysis")

and valued approximately 13 of the Subject Property's 83 Residential Units that are subject to

rent regulation ("Rent Regulated Units") separately from the rest.[18]

*Leitner's Analysis*

In valuing the Residential Units portion of the Subject Property, Leitner divided his

valuation into two components: (1) 70 "for sale" residential condominium units ("For Sale

Units") and (2) approximately 13 Rent Regulated Units.[19]

Leitner utilized the Sales Comparison Approach in valuing the For Sale Units and the

Bulk Sales Analysis for the Rent Regulated Units.  In valuing the For Sale Units, Leitner

considered eight comparables in order to formulate an appropriate price per square foot for the

Subject Property.[20]  In surveying the eight comparables, Leitner formulated an adjusted range of

---

[17] Both Leitner and Haims determined that the Cost Approach is inappropriate in valuing the Subject Property because (1) the Cost Approach is less effective and unreliable for estimating market value where a subject property is not brand new or close to brand new construction, (2) the Cost Approach gives only indirect consideration of the income-producing capability of a property such that real estate investors today tend to rely less on this method, and (3) there is significant external obsolescence existing in the current market, which cannot be properly quantified by valuable market data.

[18] Tenants who occupy the Rent Regulated Units have occupancy rights that allow them to remain indefinitely at specified increases which do not necessarily reflect market rent.

[19] The "for sale" component of the Subject Property will consist of 95,127 square feet calculated as the total residential area upon completion of the 105,080 square feet, while the rent regulated units will consist of 9,953 square feet.

[20] The eight comparables are set forth as follows:

| Name | Location | Description | Adjustments | Price/Sq. Ft. |
|---|---|---|---|---|
| Princeton House | 215 West 95th Street | Built in 1987, this is a 17-story building that consists of 212 residential units and 3 retail units. | The Subject Property will be in superior condition but this comparable's health club with pool is a slightly superior amenity. | Ranges from $762 to $1,000 |

| The Packard | 176 West 86th Street | Built in 1985, this is a 47-unit building. | The Subject Property will be in superior condition. This comparable is also adjusted upward for inferior amenities. | Ranges from $800 to $1,219 |
|---|---|---|---|---|
| The Columbia | 275 West 96th Street | Built in 1983, this is a 35-story building that consists of 301 residential units and several commercial units. | The Subject Property will be in superior condition, but this comparable's health club with pool is a slightly superior amenity. | Ranges from $851 to $1,068 |
| 100 West | 100 West 93rd Street | Built in 1968, this is a 32-story building that consists of 372 units and commercial units. | The Subject Property will be in superior condition and this comparable is also adjusted upward for inferior amenities. | Ranges from $735 to $845 |
| The Bromley | 225 West 83rd Street | Built in 1986, this is a 23-story building that consists of 304 residential units and two commercial units. | The Subject Property will be in superior condition, but this comparable's health club with pool and garage warrant a downward adjustment for superior amenities. | Ranges from $893 to $1,142 |
| The Centra | 100 West 89th Street | Built in 1985, this is a 9-story building. | The Subject Property will be in superior condition. | $977 |
| New West Condo | 250 West 90th Street | Built in 1986, this is a 22-story building that consists of 157 residential units and two commercial units. | The Subject Property will be in superior condition, but this comparable's health club with pool is a slightly superior amenity. | Ranges from $753 to $1,412 |

$911 to $1,137 per square foot, with an average of $1,010 and a median of $981 per square foot.
In considering the adjusted range, Leitner arrived at a valuation of $1,000 per square foot for the
Subject Property.  In addition, Leitner deducted a condominium charge of $12 per square foot
and estimated an absorption rate of nine units per quarter over a two-year sellout period.

In valuing the Rent Regulated Units, Leitner consulted Mr. Mark Zborovsky
("Zborovsky"), a leading broker in deals for bulk packages of unsold cooperative and
condominium units in Manhattan and the outer boroughs.  It is Zborovsky's opinion that
investors in this niche market are generally seeking properties with either positive cash flow or
little negative cash flow[21] (less than $200 per unit per month).  Zborovsky further informed
Leitner that for occupied rent regulated units, a 60% to 90% discount factor is considered,
averaging around 65% to 70%.  Based on this information, Leitner considered five bulk
cooperative sale comparables and found discount factors range from 24.6% to 52.8%.  Based on
rent roll of the Subject Property submitted in November 2007 with some adjustments, Leitner
estimated that the Rent Regulated Units are operating at a negative cash flow per unit per month
of $600.  Leitner opines that, based on the negative cash flow and the small number of units, a

| The Harrison | 205 West 76th Street | Built in 2009, this comparable consists of 132 residential units, grade level retail, and a second floor Equinox gym. Research suggests that 83 sales within this comparable averages $1,546 per square foot.  A majority of these sales occurred in 2007 and 2008, and approximately 20 units remain on the market. | As a new construction, this comparable is superior to the Subject Property. This comparable's location is superior and its garage is a superior amenity that warrant downward adjustment. | Ranges from $1,120 to $2,426 |

[21] Positive and/or negative cash flow is the ratio of rents received to the maintenance or condominium/taxes paid.
(Garrison Ex. 1 at 89.)

14

70% discount to market is warranted and assigned a valuation of $3,000,000 to the Rent
Regulated Units.

In valuing the Townhouse portion of the Subject Property, Leitner used the Sales
Comparison Approach.  He analyzed comparables, selected a sellout price per square foot in the
amount of $1,500, and arrived at a gross sales value of $5,200,000 for the Townhouse.

Leitner utilized the Income Approach in valuing the Commercial Units.  He finds that
discounted cash flow analysis is appropriate here because, based on the November 2007 rent roll,
most of the commercial tenants have expiring leases. (Garrison Ex. 1 at 99.)  After researching
retail leases in the area, surveying seven comparables, and adjusting according to mid-block and
corner unit locations, Leitner concluded, for the Subject Property's Gross Leasable Area
("GLA"), a $90 per square foot for the Subject Property's corner space and $75 per square foot
for the Subject Property's mid-block space. (*Id*. at 101.)  A projected vacancy discount of 7%,[22]
projected expenses of $12 per square foot, and 1% management fee is applied to the gross value
of the GLA.  Notably, an investor's discount rate of 9.5% and a terminal capitalization rate[23] of
8% are applied to the gross value of the GLA.[24]  Leitner concludes that the valuation for the
Commercial Units is $6,300,000.

After arriving at a quarter-by-quarter sellout of the For Sale Units and the Townhouse in
the gross sales amount ("Gross Sales") of $101,182,759, Leitner determined a prospective net
sellout value ("Prospective Net Sellout Value") of $69,288,951 upon completion by accounting

---

[22] Leitner stated that, historically, the Upper West Side has a stable retail environment with vacancy rates ranging
between 3% and 5%.  However, due to recent economic troubles, he is of the opinion that the vacancy rate discount
should be increased to 7% for the Subject Property.
[23] The investor's discount rate is essentially the acceptable expectations of yields desired by investors in the current
marketplace.  Leitner considered (1) the Korpacz Real Estate Investor Survey, which provided an average rate of
9.38% and (2) the Real Estate Research Corporations ("RERC") report, which provided an average rate of 9.6%
(Garrison Ex. 1, 104).
[24] In arriving at this rate, Leitner considered the (1) Korpacz Real Estate Investor Survey, which provided an average
rate of 8.41%, and (2) the RERC report which provided a rate of 8.8% (*Id*. at 105).

for (1) carrying costs,[25] (2) a developer's discount,[26] and (3) present value factor to completion.[27]  Out of this amount, an estimated amount of $25,008,000 in construction costs is deducted, resulting in a subtotal ("Subtotal Prospective Residential Net Sellout") of $44,280,951.

Thereafter, the $3,000,000 valuation of the Rent Regulated Units is then added, a two-year discount at 12%, which accounts for the re-submission and re-approval of the Project by the Attorney General's office, arriving at an adjusted total ("Adjusted Total") of $37,680,844. Finally, the value of the Commercial Units, in the amount of $6,300,000 is added to the Adjusted Total, which brings the valuation up to the "as is" value of $44,000,000. (*Id*. at 112.)

*Haims's Analysis*

In arriving at the "as is" market value of $66,300,000 for the Subject Property's 83 proposed Residential Units, Haims used a "blended approach," combining components of both the Sales Comparison Approach and the Income Capitalization Approach.  First, by using the Sales Comparison Approach, Haims estimated the present value of the Subject Property's 83 Residential Units when completed.  Haims selected The Harrison as the only comparable in his analysis because he opines that the sales of The Harrison are most similar to the Subject Property's Residential Units, if completed.  Based on the comparable sales of the condominium residential units of The Harrison, Haims made downward location adjustments[28] and a

---

[25] Carrying costs, in the amount of $9,766,788, include marketing expenses at 5% of Gross Sales, sales commission at 3% of Gross Sales, legal and transfer costs at 1% of Gross Sales, $1,416 per unit per month in real estate taxes, and $1,359 per unit per month of common charges.

[26] A developer's discount is the reasonable fee paid to a developer to assume the risk associated with financing, completing construction, and absorption of the Project.  Leitner opined that, although a developer's discount is generally approximately 5% to 10% of the Gross Sales, a 15% of Gross Sales, in the amount of $15,177,414, is appropriate here given the current economic climate and the speculative nature of the Project.

[27] The present value factor to completion essentially discounts the cash flows based on the time value of money, meaning "the present value of the Project if it were completed today." (1 Evid. Hrg Tr. 29.)  After reviewing yield rates in the third quarter of 2009 as provided by the RERC report, Leitner selected a discount rate of 12%, which is the upper end of the survey. (Garrison Ex. 1, 111.)  Leitner applied the 12% discount rate for a two-year sellout period starting in November of 2011 and ending in August of 2013. (*Id*. at 112.)

[28] Given that The Harrison's location is more central within the Upper West Side and is closer to many high-end national and local retailers, museums, the Plaza, and Midtown office district, Haims opines that the Subject

downward market conditions adjustment for the general decrease in property value as a result of

the recession.[29]  He also made adjustments to individual units based on the floor level, size,

number of bathrooms, and the presence of a terrace or balcony.  After the adjustment process,

Haims opines that the average value of the Residential Units is $1,214 per square foot.

Next, Haims used a two-year discounted cash flow analysis, which assumes that all of the

Residential Units would be sold off in two years – by November 2011.  Haims finds that, with

aggressive marketing, 30 of the 83 units can be expected sold in the first year and the remaining

units in the second.  Further, he concludes that the 13 occupied Rent Regulated Units would be

sold as a package at a 50% discount in the first year.  In his analysis, Haims assumes that all

necessary re-approval of the Project's conversion plans could be achieved within approximately

three months time.

Besides the absorption factor, Haims also estimated expenses, carrying costs, and

development costs to be approximately $21,722,351 for the Residential Units portion of the

Project and deducted this amount in year one of the discounted cash flow analysis.  Finally,

Haims deducted an additional 8% discount rate to reflect a return on investment capital and a

20% entrepreneurial profit, arriving at the above-mentioned "as is" value of $66,300,000 for the

Residential Units.

In valuing the Townhouse portion of the Subject Property, Haims used the Sales

Comparison Approach by analyzing four comparables, adjusting for differences between the

comparables to the Townhouse and arrived at a gross sell-out value of $5,500,000.  Thereafter,

---

Property's location is inferior to that of The Harrison's and applied a 10% downward location adjustment in his analysis.

[29] According to the Corcoran Report, Third Quarter 2009, the average price per square foot for condominium apartments of new developments in the Upper West Side decreased by 16% compared to what it was one year ago. Based on this information, Haims adjusted the price per square foot at a rate of 1% per month from the sales' contract dates through the date of the value, which is November 11, 2009.

Haims deducted both the costs of construction and a 25% development cost (also known as entrepreneurial profit), and also discounted an estimate of one year to construct the Townhouse at an 8.5% discount rate.  Thus, his final "as is" valuation of the Townhouse is $3,280,000.

Next, in valuing the Commercial Units portion of the Subject Property, Haims used the Income Capitalization Approach and the Direct Capitalization method.  First, Haims determined the anticipated annual net operating income.  He then applied an overall capitalization rate and converted the annual net operating income into a final value for the Commercial Units.  Haims determined that five out of the six Commercial Units at the Subject Property are currently occupied.  By using the lease abstracts provided to him by current tenants, Haims created a commercial rent roll, which indicates that the current annual rents (blended) of the Commercial Units at the Subject Property range from $65.89 to $118.04 per square foot. (Debtor's Ex. C, 99.) For the unit that is currently vacant, Haims selected a market retail rate after considering three comparable retail leases located close to the Subject Property.  After deducting a vacancy and collection loss factor of 5%, operating expenses of 3%, and management expenses of 1%, Haims applied an overall capitalization rate of 6.5% based on rates suggested from two sources: the Korpacz Real Investor Survey, Third Quarter 2009 and the Realtyrates.com Investor Survey, 4th Quarter 2009.  He subsequently arrived at the valuation of $10,025,000 for the Commercial Units portion of the Subject Property.

After arriving at a valuation of $66,300,000 for the Residential Units, $10,025,000 for the Commercial Units, and $3,280,000 for the Townhouse, Haims concluded a total valuation of $79,605,000 for the Subject Property.

*Residential Units*[30]

---

[30] Leitner estimated the gross sell-out value of the Townhouse to be $5,200,000 while Haims estimated it to be $5,500,000.  The primary discrepancy between the two experts' opinions lies in the amount of deductions made in

The Court finds that the Leitner valuation of the Residential Units is more credible than the Haims valuation. Leitner used eight comparables in his Sales Comparison analysis of the Residential Units while Haims used only one. In valuing the Townhouse portion of the Subject Property, Haims testified that he used four comparables in his analysis and testified that "according to appraisal text books….you need a minimum of three comparable…." (2nd Evid. Hrg. Tr. 79.) Yet, in his analysis of the Residential Units, Haims used only one comparable. Haims also stated that "Age is just one of the many factors that an appraiser should look at." (*Id.* at 81.) Yet due solely to the fact that The Harrison is a brand new construction, he conducted an analysis inconsistent with industry standards by relying on The Harrison as his only comparable and deliberately ignored comparables, such as those used by Leitner in his analysis, that are similar in age to the Subject Property. Given that The Harrison's price per square foot is substantially higher than those of the other seven comparables that Leitner presented in his expert report, it is apparent that Haims chose to use The Harrison as his only comparable in order to reach a desirable valuation for the Subject Property.

In addition, the Court finds that The Harrison is not the best comparable to the Subject Property because significant differences exist between the two properties. First, the Subject Property is a rehabilitated building while The Harrison is a brand new construction. The fact that the Subject Property, in its completed form, will consist of renovated interiors and additional floors does not make it an equivalent of a brand new constructed building regardless of Haims's view to the contrary. Second, the Subject Property lacks many of the superior features and amenities that The Harrison possesses, none of which Haims made adjustments for in his analysis. For example, The Harrison's average ceiling height is higher and the window sizes of

---

obtaining the "as is" value. Issues relating to deductions, such as entrepreneurial profits, present value discount rate, and the number of years discounted are discussed herein. In any event, as the Townhouse is but a small portion of the Project, its valuation would not substantially impact the overall "as is" value of the Subject Property.

its units are larger.  The Harrison has a large parking garage and in-unit washer and dryer, both

of which the Subject Property lacks.  The Harrison has a state-of-the-art health club, Equinox,

while the Subject Property will have a gym.  The Harrison has the HVAC system while the

Subject Property has the PTAC system.  Each of these features and amenities, viewed in

isolation, may not significantly affect the value of a given property; taken altogether, however,

they can meaningfully impact the value of a property.  Thus, it was unreasonable for Haims to

summarily dismiss the cumulative effects of those differences and make no accompanying

adjustments in his analysis.[31]

       In light of the methods and comparables used by both experts, the Court finds Leitner's

analysis to be more persuasive and concludes that $1,000 per square foot is the accurate value for

the Subject Property's Residential Units.[32]

       The two other disputed issues that resulted in substantially divergent valuations with

respect to the Residential Units in Leitner and Haims's analysis are (1) the selection of an

anticipatory yield rate, and (2) the estimate of time it takes to sell out the Residential Units.

*Yield Rate*

       Leitner selected a yield rate of 12%, Haims selected a yield rate of 8%, and both agreed

that the yield rate desired by investors in the current marketplace is approximately 10%.[33]

Leitner's selection of 12% is reasonable because, as discussed herein, the Court finds that the

Project is substantially riskier than an average real estate development project.  In accounting for

---

[31] Haims's credibility was also put into question during cross-examination as he was unfamiliar with several of the properties that are potential comparables and he was also unable to answer many of the inquiries about the fundamental features and amenities of The Harrison. (2nd Evid. Hrg. Tr. 87-97.)  For example, Haims was uncertain about the ceiling height and the type of ventilation and air conditioning systems of The Harrison.

[32] The Court finds that the Bulk Sales Analysis appropriately values the Rent Regulated Units as such units produce substantially lower income than the For Sale Units.  Thus, the Court finds the Leitner valuation of the 13 Rent Regulated Units to be reasonable.

[33] RERC report indicated an average discount rate of approximately 10% (Garrison Ex.C, 111.) and Korpacz Real Estate Investor Survey, Third Quarter 2009 also indicated an average discount rate of approximately 10% (Debtor Ex. C, 93.)

the speculative nature of this venture in addition to the current economic environment, a 12%

yield rate is the more appropriate yield rate for this matter.

*Approval and Sell Out Period*

With respect to the estimated time before all the Residential Units could be sold out,

Leitner estimated a total of approximately forty-eight months while Haims estimated a total of

approximately twenty-four months. Leitner estimated twenty-four months for the Debtor to

complete construction and obtain approval from the Attorney General and another twenty-four

months to sell out the Residential Units.[34] Haims, on the other hand, accounted for only the

twenty-four month sell out period in his valuation analysis.[35]

A significant assumption about which the parties disagree is the time required for the

Project to receive approval from the Attorney General. Obtaining approval is a prerequisite for

selling out units of the proposed Project, and the time frame within which such approval can

reasonably be obtained directly affects the present value and ultimately, the "as is" value of the

Subject Property. Garrison's valuation assumes an approval period of twenty-four months and

the Debtor's valuation assumes an approval period of approximately three months. The Court

finds that whether the Project would ultimately obtain approval for conversion is speculative.

Even assuming that approval can be obtained, the reasonable time for such approval would be at

least twenty-four months given the numerous issues unique to the Project that would have to be

addressed in the approval process.

Haims testified that he is "pretty sure" that it takes about three months from the time the

offering plan is filed with the Attorney General to the time the plan is approved. (*Id*. at 56.)

---

[34] As indicated in Leitner's "As is Cash Flow" analysis, the sell-out period of the Residential Units starts on November 2011 and ends on August 2013. (Garrison Ex. 1, 112.)

[35] As indicated in Haims's "Summary of Component Cash Flows," the sell-out period of the Residential Units starts in 2009/2010 and ends in 2010/2011. (Debtor Ex. C, 95, 89.)

However, he was unable to name even one condominium conversion where the sponsor obtained

Attorney General approval within three-months time. (*Id.*) Leitner also testified that he has

never heard of a single condominium conversion that has been commenced, filed, and approved

in a period of less than three months. (1st Evid. Hrg. Tr. 16.)

Mr. Heller, a former Assistant Attorney General, testified, among other things, that (1)

New York General Business Law section 352-eeee requires that a property does not have

excessive vacancies for a period of five months before a proposed plan is submitted (also

referred to as warehousing);[36] (2) section 362-eeee also requires a four to six month period, upon

filing of a proposed conversion plan, for tenants to comment on the plan; (2nd Evid. Hrg. Tr.

138-40.) (3) an average of five to six months for the Attorney General to review the plan, (*Id.* at

141-42.); and (4) an average of another four to five months for the Attorney General to verify

that 15% of the pre-sold units are made to purchasers for principal residences. Significantly, the

statute requires that this 15% verification requirement be completed in fifteen months. (*Id.* at

135-44.) After having inquired about the Subject Property at the Attorney General's Office, it is

Heller's understanding that the Project's submitted plan was abandoned around December of

2008. (*Id.* at 151.) There is no dispute that fifteen months have elapsed since the verification

period began. Based on Mr. Heller's experience in representing sponsors, drafting proposed

plans, and reviewing plans at the Attorney General's Office, the Court finds his testimony

regarding the approval process to be both credible and reasonable.

Haims testified that only 13 of the 83 Residential Units are currently occupied by tenants,

which means prior to filing its plan, the Debtor would need to lease up to 90% of the Residential

Units for a minimum of five months as required by law. Further, while the Debtor incorrectly

---

[36] The Attorney General's office has interpreted this requirement to mean that a property must have 90% occupancy
for five months prior to submitting a proposed plan. (2nd Evid. Hrg. Tr. 136.)

assumed that it can pre-sell 15% of the units pending approval from the Attorney General, Heller testified that a sponsor cannot pre-sell units until it receives final approval. (*Id.* at 142.) When asked about the Attorney General's ability to extend the fifteen-month statutory cap, Heller testified that "the Attorney General's Office has no right, power, or any other authority to extend the fifteen-month period," (*Id.* at 161.) even if a sponsor was involuntarily compelled to abandon a plan.

The Debtor argued that it would not be required to begin the approval process anew because it could persuade the Attorney General to re-approve the Project by arguing that construction was forced to a halt as a result of Arbor's wrongdoing and at no fault of the Debtor's. However, the Debtor presented no evidence to support the argument that prior approval would, in any way, expedite the re-approval process. More importantly, the Debtor put forth no evidence or legal precedent to rebut Heller's testimony that the Attorney General does not have the legal authority to extend the fifteen-month statutory cap and/or resurrect the approval of an abandoned plan even where a third party may be found to have caused the abandonment of a project. (*Id.* at 159, 161.) Hence, the Court finds no merit in the Debtor's assertion that it would be able to persuade the Attorney General to re-approve the Project on the basis of Arbor's failure to fund construction. Absent a waiver of the fifteen-month statutory cap, the Debtor would have to begin the approval process anew. Finally, the Debtor itself stated that West's filing for bankruptcy would "impose impediments on its ability to get reinstated its conversion plan." (Mot. Hrg Tr. 12, October 7, 2009.)

At first glance, Leitner's estimate of twenty-four-month period may seem long, but it is important to note that Leitner's analysis did not account for the issue of warehousing. (1st Evid.

Hrg. Tr.16-17.)[37]  Warehousing could potentially add at least another twelve months to the approval period because, as a practical matter, the Debtor would have to first complete construction of the Subject Property and lease out 90% of its Residential Units for a minimum of five months before submitting the Project for approval.[38]  Hence, in light of the warehousing issue raised by Heller, Leitner's estimate of a twenty-four-month approval period in addition to the twenty-four-month sell-out period seems reasonable and probably reflects a minimum period under all the circumstances of this case.[39]

Given the requirements under section 352-eeee, the Court finds that it is highly speculative whether the Debtor could obtain approval to reinstate its conversion plan.  Even if such approval were ultimately obtained, the reasonable length of time for this process is a minimum of twenty-four months if the plan were reinstated and thirty-six months if the plan were filed anew.[40]

The Court finds the Leitner valuation of both the For Sale Units and the Rent Regulated Units, selection of yield rate, and the estimate of approval and sell-out period to be reasonable.[41]  Therefore, the Court finds the Leitner valuation of $37,680,844 for the Residential Units of the Subject Property to be accurate.

---

[37] The issue of warehousing refers to the requirement, under New York General Business Law section 352-eeee, that a property does not have excessive vacancies for a period of five months before a proposed plan for condominium conversion is submitted to the Attorney General for approval. (2nd Evid. Hrg. Tr. 136.)

[38] It is undisputed that only 13 of the 83 Residential Units are currently occupied by tenants.

[39] Based on Heller's testimony about the issues relating to the approval process, the Haims's projection that, within twelve months, the sponsor could file a plan, obtain Attorney General approval, pre-sell 15% of the units to qualified buyers, complete construction, and sell and close 30% of the units is completely unrealistic.

[40] If it is in fact the case that the Debtor is required to lease up to 90% of the Residential Units for a five-month period before a proposed plan can be submitted, it is possible that the sell-out value of this portion of the Project would be impacted because it seems that units encumbered with leases could negatively affect such units' market value.  It is the Court's view that this issue further enhances the speculative nature of the Project.

[41] Sanders's testimony would not have changed the outcome of the Court's findings.  Even if Sanders were able to convince the Court with respect to certain adjustments concerning the discount rate for the Rent Regulated Units, his testimony would not have an impact on the findings of the approval process, which is determinative of the present value discount of the Subject Property's valuation.  More importantly, Sanders's testimony would not have addressed the most crucial aspects of this case, which are the contingencies, and the level of speculation involved in the completion of the Project, and its ultimate value.

*Commercial Units*

With respect to the valuation of the Commercial Units, the Court finds Haims's opinion with respect to the net operating income generated from the Commercial Units to be persuasive because it appears that Haims's analysis is based on personal knowledge about existing leases and the Subject Property's current commercial rent roll. Haims testified that, in the course of making his valuation, he examined current lease abstracts, which contained the amount of rent and lease expiration terms of each of the five occupied units. (*Id*. at 30.) Further, Haims included the Subject Property's "Commercial Rent Roll (11/09-11/10)" in his expert report which stated the identities of current tenants, leased area, monthly base rent, annual base rent, lease expiration date, and annual base rent per square foot. (Debtor Ex. C, 99.) Leitner's analysis, on the other hand, was based completely on market rent and assumed no existing leases (1st Evid. Hrg. Tr. 39.) Leitner was not aware of the rental income generated from the Commercial Units even though he conceded that income from the Commercial Units would have an impact on his valuation. (*Id*. at 41.) Although only three out of the seven Commercial Units have long-term lease terms, the Court finds that Haims's overall valuation of the Commercial Units' gross and net operating income of $805,230 and $651,623, respectively, (Debtor Ex. C, 103.) to be persuasive.

The Court also finds that Haims's estimated vacancy rate of 5% falls within the range of vacancy rates in the Upper West Side; Leitner even concedes this in his expert report. Leitner's selection of a 7% vacancy rate is based on nothing more than his personal observation that "recent economic troubles have caused increasing vacancy rates as is evident by several available storefronts along Broadway, Amsterdam and Columbus Avenues" (Garrison Ex. 1, 102.) and not supported by valid statistics and facts.

However, Haims's selection of a 6.5% capitalization rate lies outside industry standards, and the Court finds that a capitalization rate of 8% is more appropriate.  Based on surveys in the Korpacz Third Quarter 2009, which indicates a national terminal rate of 7.5% to 11.0% (average 8.41%), and the RERC Third Quarter 2009 (8.8%), which indicates a national terminal rate of 7.5% to 10.0%, Leitner opined that 8% is an appropriate rate for the Subject Property.  Haims, on the other hand, selected a rate of 6.5% based on the Korpacz survey and another source, the Realtyrates.com Investor Survey, 4th Quarter 2009, which indicates an overall capitalization rate range 5.89% to 13.7%. (Debtor's Ex. C, 102.)  In his expert report, Haims explained that he selected this rate because of the Subject Property's "attractive retail location, quality, tenancy, and the quality of the overall condominium project of which the subject is a part…."  (2nd Evid. Hrg. Tr. 103.)  When inquired about the identity of the publisher of Realtyrates.com and whether this internet source is a subscriber-restricted website, Haims replied that he did not know. (*Id*. at 85.)  Haims further testified that although he is of the opinion that the Subject Property possesses superior location, he considers the quality of tenants at the Subject Property to be "mid range." (*Id.* at 82.)  Lacking evidence that Realtyrates.com is a credible source and because the tenants at the Subject Property are of mid-range quality, the Court finds that the national average capitalization rate of 8.0%, as indicated by the Korpacz survey, is the appropriate rate.

In sum, in applying an 8.0% capitalization rate to a net operating income of $651,623 over a ten-year holding period, the Court finds that the value of the Subject Property's Commercial Units is $8,145,287.50.

### Construction Costs

The Court finds that construction costs necessary to complete the Project are likely in excess of $25,000,000.  Leitner assumed a construction cost estimate of $25,000,000 in his

expert report but testified that he believed that to be the absolute lowest reasonable number (1st

Evid. Hrg Tr. 22.) and simply accepted the Debtor's estimate in his report.  Haims testified that

he obtained estimated construction costs in the amount of $23,300,000 from one of the Debtor's

employees, Daniel Deutsch, and verified that amount to be a reasonable "blended cost" estimate

using the Marshall & Swift Cost Manual. (2nd Evid. Hrg. Tr. 67-69.)  Haims subsequently

testified that construction costs for new construction range from $400 to $500 per square foot.

(*Id.* at 101.)  He also testified that the Project consists of a total of approximately 35,000 square

feet of new construction and 82,000 feet of rehabilitation construction.  (*Id.* at 103.)  Thus,

completing the new construction portions of the Project would cost approximately $15,000,000,

which leaves approximately $8,000,000 for the 82,000 square feet rehabilitation portion

(approximately $72 per square foot).  Haims agrees with this deduction and stated that he,

nonetheless, believes $23,300,000 to be a reasonable estimate because "construction costs have

fallen dramatically" and "there are a lot of construction workers that aren't working."  (*Id.* at

104.)  However, he offered no proof or statistics to support these assertions.  Thus, the Court

finds that the reasonable amount necessary to complete construction of the Project is likely in

excess of the assumed amount of $25,000,000.

Based on two unsigned appraisal reports of the Subject Property by Leitner's firm dated

August and November of 2007, the Debtor argued at great length that Leitner's current valuation

of $44,000,000 is unreasonable in light of his firm's appraised value of $82,000,000 for the

Subject Property two years ago.  However, the Court finds that the discrepancy in values was

clearly and reasonably explained by Leitner in his testimony that (1) the market price per square

foot of the Commercial Units of the Subject Property peaked at $1,220 (1st Evid. Hrg. Tr. 74.) in

2007, which has since decreased to $1,000 in today's market and (2) the discount rate has

increased by 200 points (2%) from the 2007 appraisal to the current 2009 appraisal. (*Id*. at 69.)

In light of the changes in the marketplace, the Court concludes that the Subject Property

is valued at approximately $45,845,287.50, which reflects the Leitner valuation of $44,000,000

with an upward adjustment of $1,845,287.50 for the Commercial Units portion of the Subject

Property.[42]

*Financing*

Finally, a critical assumption underlying each expert valuation is that the Debtor is able

to obtain sufficient financing to complete construction of the Project.  In fact, the viability of the

Debtor's chapter 11 case hinges on its ability to obtain such financing.  Absent financing to

complete the construction of the Project, the value of the Collateral at issue would be worth

considerably less than Residential's $46,000,000 lien on the Subject Property at the West level

and, therefore, the Debtor would have no value in its membership interest.  The Collateral would

then be worthless.  The Debtor and West have filed a joint motion for order to obtain post-

petition financing from Arko Holdings, LTD ("DIP Financing Motion") on November 13, 2009,

a motion that is currently pending before the Court.  The Debtor has represented to the Court that

it has been unable to obtain post-petition financing except on a priming basis.  The proposed

priming would occur in both the West's and the Debtor's case.  Consequently, the key

---

[42] The Debtor also tried to maximize the valuation of the Subject Property by arguing that West would refrain from taking an entrepreneurial profit in developing the Project.  However, both Leitner and Haims testified to the contrary and included in their expert reports entrepreneurial profit as a necessary cost in completing the Project.  Haims testified that, "For a property like this, a condominium sellout, I believe that any developer who would undertake such a project would anticipate and expect to receive profit…." (2nd Evid. Hrg. Tr. 76.)  Similarly, when asked whether an entrepreneurial profit is a standard assumption in projects of this type, Leitner answered, "You have to have a developer's fee, otherwise what's the incentive for someone to take this project on." (1st Evid. Hrg. Tr. 28.)  In fact, Haims included a 20% entrepreneurial profit in his report throughout the condominium sellout period (Debtor Ex. C, 95.)  Not only is the Debtor's proposed course of conduct outside of industry standard, more importantly, it would breach West's fiduciary duty to its estate's creditors to abdicate such profit income in order to enhance the value of its parent company, the Debtor.  Moreover, for the reasons discussed herein with respect to the valuation of the Subject Property and the contingencies relating to the Project, even the elimination of an entrepreneurial profit would not change the outcome of this case.

determination before the Court is the Debtor's likelihood of obtaining post-petition financing on

a priming basis.

Section 364(c) of the Bankruptcy Code provides

"If the trustee[43] is unable to obtain unsecured credit allowable under section 503(b)(1) of

title [11 USC § 503(b)(1)] as an administrative expense, the court, after notice and a

hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in section
    503(b) or 507(b) of this title [11 USC § 503(b) or 507(b)];
(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C.  § 364(c).

Courts have generally deferred to a debtor's business judgment in granting section 364

financing.  *In re Ames Dept. Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *In re Snowshoe*

*Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-

514 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 499 (Bankr. D. Colo. 1985).

However, granting post-petition financing on a priming basis is extraordinary and is allowed

only as a last resort.  *In re Seth*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("The ability to prime

is extraordinary"); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re*

*Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3rd Cir. 1994); *In re Becker Indus.*, 58 Bankr.

725, 736 (Bankr. S.D.N.Y. 1986) (holding that the application of what is adequate protection for

secured creditors is left to the vagaries of each case "but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.").

---

[43] Section 1107(a) of the Bankruptcy Code gives DIP the same rights as trustee under section 364.  A court may
authorize DIP to enter into certain post-petition financing arrangements if the requirements of section 364 are met.
*See Suntrust Bank v. Den-Mark Constr., Inc (In re Den-Mark Constr., Inc.)*, 406 B.R. 683, 689 (E.D.N.C. 2009).

Further, priming is impermissible unless there is adequate protection to existing lien holders. *See In re First South Sav.*, 820 F.2d 700, 701-11 (5th Cir. 1987).

Section 364(d)(1) provides: "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise;[44] and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."[45]

11 U.S.C. § 364(d)(1).

Under section 364(d), the trustee or DIP has the burden of proof on the issue of adequate protection. *11 U.S.C. § 364(d)(2)*.

The existing of an equity cushion seems to be "the preferred test in determining whether priming of a senior lien is appropriate under section 364." *In re Strug-Div., LLC*, 380 B.R. 505, 513 (Bankr. Ill. 2008); *see Snowshoe*, 789 F.2d at 1088-90; *see In re Dunes Casino Hotel*, 69 B.R. 784, 795-96 (Bankr. D. N.J. 1986); *In re Reading Tube Indus., Inc.*, 72 Bankr. 320, 333-34 (Bankr. E.D. Pa. 1987) (Where there is no equity cushion, section 364(d)(1)(B) is not satisfied). There are also courts that have adopted a more "holistic approach" by analyzing all relevant facts "with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means

---

[44] Generally, courts require only a showing of reasonable effort; debtors are not required to seek an alternative financing from every possible lender. *see Snowshoe*, 789 F.2d at 1088; *In re Central Park*, 136 B.R. 626, 631 (S.D.N.Y. 1992). It is up to each court to determine, on a case-by-case basis, whether a debtor's effort in seeking alternate source of financing meets the requirement under section 364. *In re Reading*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). The debtor bears the burden of proof under section 364(d)(1)(A). *Id.*

[45] Adequate protection is defined in 11 U.S.C. § 361 as requiring (1) periodic payments, (2) additional or replacement lien, or (3) other "indubitable equivalent" of the creditor's lien interest. *11 U.S.C. § 361*.

of the Plan, and the Debtor's performance in accordance with the Plan." *In re Tashjian,* 72 B.R. 968, 973 (Bankr. E.D. Pa. 1987); *See In re Aqua*, 123 B.R. 192, 196-97 (Bankr. E.D. Pa. 1991).[46]

Based upon the current status of the Subject Property, neither the Debtor nor West has any ability to provide adequate protection to a lender. Therefore, the only form of adequate protection for either the Debtor or West is the potential increase in value of the Subject Property if and when construction of the Project is completed.

There are several cases that dealt with facts similar to those in this case. In *Central Park*, the debtor was seeking to obtain a DIP loan in the amount of $625,000, on a priming basis, to renovate a property. *Central Park*, 136 B.R. at 629-30. The subject property was valued at between $2,200,000 and $2,250,000, subject to an existing mortgage held by a secured creditor, Hancock, in the principal amount of $3,950,000. *Id.* at 628-30. Both appraisers in this case agreed that the proposed renovation to the property will most certainly increase the value of the subject property, although they disagree with respect to the amount of value increase. *Id*. at 630. The court ultimately concluded that the renovation will cause the subject property to increase in value by approximately $800,000. *Id.* The key finding is that "there is no question that the property would be improved by the proposed renovations and that an increase in value will result." *Id.* at 626, 631. In support of this, the debtor offered evidence that a new tenant, Leather Center, was prepared to enter into a 15-year lease with the debtor, upon reconstructing the property's premises. *Id.* at 629. In light of the fact that the projected property improvements will exceed the value of the post-petition loan, the court found that Hancock's interest will be adequately protected after the approval of the proposed $650,000 senior loan. *Id.* at 632.

---

[46] The purpose of adequate protection is to ensure that "creditor receives the value for which he bargained prebankruptcy." *In re Swedeland*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *See Dunes*, 69 B.R. at 793-94; *In re Windsor Hotel*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) (holding that adequate protection is designed to preserve prepetition position of existing lenders).

Faced with similar facts and legal issues, the court in *Suntrust* reached a different outcome. The debtor in *Suntrust*, was a real estate developer that was seeking court approval for a DIP loan on a priming basis, to develop a property, consisting of lots and acres of land, into homes. *Suntrust*, 406 B.R. at 686-87. The bankruptcy court granted the debtor's DIP financing motion; the district court reversed and found a lack of adequate protection for the secured creditor in question under section 364(1). *Id.* at 700. In reaching its decision, the court applied the reasoning by the Court of Appeals for the Third Circuit in *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 566, and explained, "[C]ontinued construction based on projections and improvements to the property does not alone constitute adequate protection. Those cases which have considered improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable. [internal citations omitted]" *Id.* The court concluded that "given the equity cushion is small and the enhancement of value is too speculative, SunTrust has not been sufficiently assured of the indubitable equivalence of its existing security." *Id; see also In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987) (holding that existing mortgagee would not be protected if it was primed by a new construction loan and superpriority lien because the potential success of the renovation project is too speculative); *See Strug-Division*, 380 B.R. at 514-15; *see In re Mosello*, 195 B.R. 277, 293 (Bankr. S.D.N.Y. 1996).

In the Debtor's DIP Financing Motion, it requests court authorization to obtain DIP financing secured by a senior lien priming *both* the positions of Residential and Garrison. Thus, the Court needs to determine (1) whether priming of Residential's $46,000,000 Mortgage Loan, on the level of West, is appropriate under section 364; and (2) whether priming of Garrison's

$20,000,000, on the level of the Debtor, in addition to Residential's $46,000,000 lien, is

appropriate under section 364.

In light of the Court's finding of $45,845,287.50 as the value of the Subject Property

even without considering the speculative aspect of the Project, a request for priming would be

denied in the West Chapter 11 Case under section 364(d) and hence denied in the Debtor's case

as well.

Even if the Court were persuaded by the Haims valuation of the Subject Property and

found that the Debtor had some equity in the Collateral, priming would still be denied under

section 364(d) because it is highly speculative whether the Project can be completed in the first

instance. While the *Central Park* court found that there is virtually no doubt that the renovation

in that case will increase the value of the debtor's property, there are numerous contingencies in

this case with respect to whether the Debtor could successfully complete construction of the

Subject Property and its ultimate value, if completed. First, the Court has already found that

whether the Project would obtain re-approval by the Attorney General is highly speculative.

Second, there is little certainty as to how long it would take to obtain re-approval, complete

construction, and sell out all of the units of the Subject Property. Third, there is no guarantee

that the Debtor would not, once again, abandon the Project as it did a year ago. Four, it is

uncertain whether the proposed DIP financing would be enough to satisfy construction costs and

carry costs necessary to complete the Project, particularly because construction costs are likely in

excess of $25,000,000. More importantly, the proposed DIP loan becomes due in 180 days, at

which time the construction of the Project would be far from completion and the Project would

then have to be refinanced.[47] Similar to the development projects in *Suntrust*, the successful

_____

[47] The record is clear that the Debtor would have to obtain refinancing when the proposed DIP loan becomes due in
180 days. Based upon the approval process that the Court finds to be most reasonable, the Debtor would not be able

rehabilitation of the Subject Property is highly speculative.  Even assuming the most optimistic

valuation, which this Court has found not to be the appropriate valuation for the Subject

Property, the equity cushion at the Debtor level is tenuous at best due to the contingencies

discussed herein.  Further, this Court would not, based upon the record to date, allow priming of

senior liens pursuant to section 364(d)(1) under such circumstances.

For all of the same reasons discussed, the Debtor's request for priming of Garrison's lien

would fail.  Without any other source of financing, the Debtor will not be able to complete

construction of the Project and is, therefore, without any equity in the Collateral.

### Prospect of Effective Reorganization

In *Timbers,* the United States Supreme Court held that to establish that collateral is

necessary for an effective reorganization under section 362(d)(2), a debtor must show that the

"property is essential for an effective reorganization that is in prospect."  *United Sav. Ass'n v.*

*Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376, 108 S. Ct. 626, 98 L. Ed. 2d 740

(1998) (internal quotations and citation omitted).  This means "a reasonable possibility of a

successful reorganization within a reasonable time."  *Id; In re Diplomat Electronic Corp.*, 82

B.R. 688, 693 (Bankr. S.D.N.Y. 1988) (no sufficient showing of effective reorganization where

"the debtors' hopes and aspirations for reorganization, although well-intended, have not been

supplemented by any showing that a reorganization is possible, let alone reasonably likely within

a reasonable period of time"); *In re Loco Realty Corp.*, AJG No. 09-11785 (Bankr. S.D.N.Y.

2009) (finding that "the uncertainty of the Debtor's cash flow, combined with the questionable

ability of the Debtor to make the indeterminate balloon payment, makes any prospect of

successful plan speculative at best").

---

to generate any income through the sales of units necessary to satisfy the repayment of the proposed DIP loan in 180
days.

However, the "analysis of a plan's feasibility under section 362(d)(2) is not the same as review of a plan at confirmation." *In re White Plains Dev. Corp.*, 150 Bankr. 948, 950 (Bankr. S.D.N.Y. 1992) (citation omitted). Debtors need not show that a plan is confirmable but that the "proposed plan has a realistic chance of being confirmed and is not patently unconfirmable." *Id.* (citation omitted).

Section 1129(a)(8), in relevant parts, provides, "The court shall confirm a plan only if all of the following requirements are met…with respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." *11 U.S.C. § 1129(a)(8).*

The Debtor proposes three methods of effective reorganization: (1) filing an application to compel Residential to fund the construction loans, (2) obtain DIP financing, or (3) file an application for a sale of the Subject Property.[48]

Turning to the Debtor's first proposal, the prospect of success of the Debtor's State Court Litigation is purely speculative. Thus, the Debtor's plan of compelling Residential to fund the construction loan is not a feasible plan of reorganization. Second, as discussed herein, the prospect of the Debtor obtaining DIP financing on a priming basis is also completely unsupported. Without a source of funding on a non-priming basis, it is not possible for the Debtor to complete the Project and implement an effective reorganization. Such non-priming source does not exist. The Debtor's argument that a 363 sale of the Subject Property is an effective reorganization under section 362(d)(2) is without merit because there is no legal

---

[48] Apparently the Debtor recognizes that a plan could only be confirmed in this case under section 1129(a)(8)(B) since Garrison has stated that it will vote against the Debtor's proposed plan. Under section 1129(a)(8)(B), Garrison would have to be left unimpaired. Based on the status of the Project, the Debtor has no available source of funding to accomplish that. Moreover, since this is a one-creditor case, "cram down" under section 1129(b) would be impossible because there would be no accepting class as required by section 1129(a)(10). Section 1129(a)(10) provides "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." *11 U.S.C. § 1129(a)(10).*

authority for the proposition that a sale, outside of a plan, would satisfy the "effective reorganization" standard of section 362(d)(2). More fundamentally, even if a 363 sale outside of a plan could be considered an effective reorganization under section 362(d)(2), the 363 sale proposed here is not the sale of the Debtor's asset but the sale of West's asset. The proposed 363 sale could, at best, be argued as an effective reorganization for the West Chapter 11 Case. However, as is stated above, the Court finds that there is no support for the proposition that a 363 sale outside of a plan constitutes an effective reorganization within the meaning of section 362(d)(2). In conclusion, none of the Debtor's three proposed methods constitute an effective reorganization under section 362(d)(2).

For the reasons and under the authorities discussed above, the Debtor failed to meet its burden of proof under section 362(d)(2) in showing that the Collateral is essential for an effective reorganization that is in prospect.

*Conclusion*

In conclusion, the Court finds that the Subject Property is valued at $45,845,287.50, which reflects the Leitner valuation of $44,000,000 with an upward adjustment of $1,845,287.50 for the Commercial Units portion. This is the value of the Subject Property in the event of available financing. However, the record clearly establishes that financing based upon section 364(d) priming of the secured claims in West's and the Debtor's Chapter 11 cases is not possible, and it would be unreasonable for the Court to grant the DIP Financing Motion. Thus, Garrison has met its burden in proving that the Debtor lacks equity in the Collateral, and the Debtor has failed to meet its burden in proving that there is any likelihood of an effective reorganization pursuant to 11 U.S.C. § 362(d)(2). Accordingly, for the foregoing reasons, the

36

automatic stay under section 362(a), reimposed under section 105(a), should be lifted.  Therefore

the Motion is hereby GRANTED.

    Counsel for Garrison will settle an order consistent with this opinion.

Dated: New York, New York

    January 13, 2010


                                        **s/Arthur J. Gonzalez**
                                        ARTHUR J. GONZALEZ
                                        UNITED STATES BANKRUPTCY JUDGE